[Civ. No. 7514. Fourth Dist. May 5, 1965.]

LONDON HOMES, INC., Plaintiff and Appellant, v. CARL E. KORN et al., Defendants and Respondents.

Tiday & Casey, Ronald L. Tiday and Lawrence P. Casey for Plaintiff and Appellant.

Arthur M. Bradley and Gordon X. Richmond for Defendants and Respondents.

CONLEY, J.*—Robert H. Grant, a designer and executant of subdivisions in Orange County and other areas of southern California, and his various subsidiary organizations engaged in the same enterprises, executed an assignment of all claims which they might have against the defendants to London Homes, Inc., the plaintiff and appellant herein. For the sake of effective exposition, we shall refer to this whole group of planners and builders as ''plaintiff'' without in all instances going into the details of the preliminary relationship of these people. In other words, for the sake of conciseness, the entrepreneurs will be referred to herein under one grouping as ''plaintiff'' or as ''appellant.''

Arthur C. Korn and Carl E. Korn, brothers, had an ownership interest in three parcels of land located in or near the City of Stanton in Orange County. Arthur C. Korn and Vera O. Korn, his wife, owned approximately 6.010 acres; Carl E. Korn and his wife, Ethel A. Korn, 5.567 acres; and the estate of their father, Charles Korn, administered upon a parcel of 29.544 acres. These three pieces of land were contiguous, and they and neighboring lots caught the eye of the subdivision planners.

At that time, Arthur C. Korn and Carl E. Korn were the duly appointed, qualified, and acting executors of the estate of Charles Korn, deceased; they were two of a family of five siblings, who were the beneficiaries and heirs under the will of their father; the three sisters were Cora Schauner, Ruth A.

*Assigned by the Chairman of the Judicial Council.

Korn and Edna Pannier. The Korn brothers were never specifically named agents by any of the other heirs.

The plaintiff's predecessors made three contracts with the Korn brothers; one with Arthur C. Korn and his wife, Vera O. Korn, for their land; one with Carl E. Korn and Ethel A. Korn for their real property; and one with the two Korn brothers signing individually and not as executors for the real property administered by the estate of their father. The three contracts were essentially parallel in their terms. Each "Deposit Receipt and Agreement" was set forth on one of the printed forms of Security Title Insurance Company; they were agreements on the part of the plaintiff to purchase the 6.010 acres owned by Arthur C. Korn and his wife, the 5.567 acres owned by Carl E. and Ethel A. Korn, and the 29.544 acres owned by the heirs of Charles Korn, and administered by his estate, all at the rate of $7,100 per acre. The three contracts contained the same contingency provision, namely, that the plaintiff must approve the title and an engineering report relative to the land within 50 days after the 19th of December, 1958, the date of the contract.

Enthusiastically pushing its plans for the subdivision, the plaintiff executed written agreements to purchase adjoining parcels contiguous to or in the vicinity of the Korn property in favor of the owners, Pearlman, Bock, Ingils, Pautz, Moore, and Harring. By the end of February, 1959, the plaintiff had become obligated to pay $151,000 for these other pieces of property, had expended $4,468.44 for engineering services, and had become liable to pay approximately $11,925 for the completion of necessary engineering services on the tract; it had expended $1,738.85 for various incidental items including surveys, newspaper advertisements and plans for rezoning the area. Besides this, plaintiff argued that one-half of the $12,000 monthly overhead of the planners should properly be allocated as an expense of this project.

Part of the land in the proposed subdivision was within the City of Stanton and part of it was in Orange County outside of the city limits. Some of the parcels were originally zoned for manufacturing and some for agriculture. The plaintiff initiated proceedings to have the portions of the property in the county area annexed to the City of Stanton and also undertook the necessary official procedure to change all of the zoning to R-1. These moves were initiated immediately after the Korns signed the deposit receipts; there were necessary newspaper publications, surveys, and appearances by attor-

neys in several departments of the city. The Korn brothers were fully aware of these enterprising moves of the plaintiff, and that the subdivision planners were necessarily spending time, money and concentrated effort on the advancement of the project. On February 2, 1959, Arthur C. Korn signed and delivered to one David Clark, acting as agent for the plaintiff, a letter requesting the City of Stanton to rezone the property. In fact, Carl Korn solicited the plaintiff to help him to have certain of his property on Katella Avenue, which he was retaining, rezoned to a C-2 classification.

The efforts of plaintiff to secure the annexation of all of the land to the City of Stanton and to rezone the property as prayed were carried through to realization.

Unhappily for the plaintiff, the Korn brothers flatly told David Clark, its agent, on or about the 26th day of February, 1959, that they would not complete the transaction; someone else had made them a higher offer at the rate of $8,000 an acre for the land and they refused to make good their agreement to sell to the plaintiff at the former stipulated price. It is true that the Korns at that time contended that the condiion in each of the deposit receipts that there must be an approval of the title and of the engineering report by the plaintiff within 50 days after the date of the agreement, had not been complied with, and that, consequently, they were released from any obligation to carry out their original promises. This position was erroneous for the court found that there had been oral compliance with the 50-day requirement; the Korns evidently felt that, as no written statement of compliance was delivered to them, the plaintiff was not satisfied with the title or the engineering report and that plaintiff's request to extend the time within which it could accept the title and the engineering report showed that plaintiff had not complied with the terms of the contingent agreement within the specified time. In this respect, however, the plaintiff stated that there was no necessity of the acceptance of these conditions in writing, and that, in fact, it had actually approved both the title and the engineering report within the time limit, but had asked for a formal extension of time to do so simply because the City of Stanton had not, prior to the expiration of the 50-day limitation, finally annexed the proposed subdivision land to the city, and had not as yet rezoned the real property as requested. While we accept the trial court's finding of fact that there was an approval both of the title and the engineering report within 50 days, this

does not mean that the Korns did not act in good faith in contending that the plaintiff had lost its right to insist upon the performance of the contracts through a failure to accept title and engineering reports within the time limited.

In consternation at the situation which threatened the timely completion of the subdivision, the employees of the plaintiff finally arranged a meeting of the Korn brothers, Mr. Richmond, their attorney, Mr. Willard Pool, attorney for the plaintiff, and representatives of the plaintiff, at which a contract for the acquisition of the land from the Korns was renegotiated.

Mr. Richard L. Owen, who represented the plaintiff in its efforts to secure the land testified as follows:

"Q. Mr. Owen, you were questioned concerning a conversation in Mr. Richmond's office. At that time was it—did you believe that your agreement of December 19, 1958, was a valid agreement? A. Yes, I did.

"Q. Then why is it that you executed a new agreement wherein you agreed to pay $650 per acre more than in the original agreement? A. If we didn't acquire the Korn property we were going to sustain tremendous obligations and have to acquire quite a bit of additional ground which we had absolutely no use for and all the money that we had spent for engineering and everything would have been wasted and we had to have the Korn property or go broke, that was about all there was to it. We had to have it.

"Q. You mentioned you were advised if you didn't sign that new agreement or enter into the new agreement that you would have to go to court. Did you consider then what a court procedure would do to you concerning your development there. A. Yes, sir. We knew we would be tied up for at least two years and we couldn't stand to—financially to be tied up for two years and hold all this additional small parcels of property waiting for the outcome of the trial."

On cross-examination, Mr. Owen testified:

"Q. You wanted to get everybody together and renegotiate? A. No, sir, I didn't want to renegotiate. *I had to have title to their property.*" (Italics added.)

"Q. Did Mr. Richmond make any statement in regard to what he thought your rights were under the instrument signed at that time?

"Mr. Tiday: Object to this, if the Court please, as being incompetent, irrelevant, immaterial at that state, that far in the future as to what he is——

"The Court: I don't think so. Overruled. It's part of the conversation.

"The Witness: Would you repeat?

"By Mr. Bradley: What did Mr. Richmond say?

(Record read.)

"By Mr. Bradley: That is the deposit receipt agreement. A. He probably did and I don't remember exactly what he said.

"Q. He probably told you you were in a bad position as far as——

"The Court: I assume you are referring to the one covering the estate property only?

"Mr. Bradley: Yes.

"The Witness: He could have very likely. The thing that during this entire proceeding I was backed into a corner where I had to acquire the Korn Estate and the two Korn brothers' property and I wasn't particularly dependent upon his particular legal analysis of my position. I was trying to acquire the property and I didn't care what Gordon said or didn't say. I was just trying to get papers prepared so that title could transfer.

"By Mr. Bradley: Q. Did you care anything about what Mr. Pool said? A. He was my counsel, yes.

"Q. Did he give you advice that you had entered into a rather confused situation as far as your legal rights were concerned? A. I don't remember this being a specific statement.

"Q. But something in that nature? A. The statement was made that it was too bad that the documents were not more explicit and the fact that an escrow hadn't been opened promptly.

"Q. He told you your legal position was weak; right? A. He told me we would probably have to go to court if everybody drug their feet very long.

"Q. And you could lose? A. And we could lose."

Notwithstanding their feeling that they had not been treated fairly, the officials of the plaintiff entered into the new agreement with the Korn brothers to purchase the three parcels for $650 more per acre than was provided in the original agreement. The new contract, as finally drafted, provided for the closing of the probate estate and the execution of conveyances thereafter by all of the heirs. It appears from the record that, although the estate land was the focal point of controversy, the plaintiff agreed to pay the addi-

tional sum of money to the Korns for their individual parcels as well.

At the time of the meeting, the plaintiff was faced with this dilemma: the contract with the Korn brothers relative to the estate land was faulty and incomplete and it did not contain the names of the other heirs of the decedent as parties; it could not have been enforced specifically; the contract made by the two Korn brothers, who happened to be executors, clearly did not purport to be binding upon the estate itself. It would have been necessary if the estate were to dispose of the land to hold a sale during the probate proceedings; the executors did not want a sale by the estate; the original agreement provided that the sale by the individuals would not take place until the estate had been closed; their reason apparently was that the land had been appraised in the estate at a much lower figure than was offered by the plaintiff, and if the sale had been made by the estate, they feared that there would be a reappraisement in probate and that they would have to pay more taxes. The sale could not be specifically enforced, after the closing of the estate, because all of the heirs had not participated in it. However, there could have been a suit by the plaintiff against the Korn brothers individually on their contract to sell the entire estate property at the original figure, and the contracts of the Korn brothers and their wives covering the smaller parcels of property owned personally by them would have furnished the basis for successful actions. It seems almost certain that if the plaintiff had elected to sue the Korn brothers, it would have won, although, as stated to plaintiff by its attorney, there would have been areas of doubt in connection with such litigation. It is unquestionable, though, that there could not have been a timely completion of the subdivision if the plaintiff had resorted to the law courts.

The theory of plaintiff's suit was that, by virtue of ''business compulsion,'' or what would amount to duress, the plaintiff was forced to pay $650 per acre more than it had originally agreed to do.

■ Was there duress or ''business compulsion'' within the meaning of the law of this state? The answer is clearly ''No.'' At the time of the refusal of the Korn brothers to keep their word as incorporated in the deposit receipts, the plaintiff could have brought suit against them for damages; but for what appeared to them to be good business reasons, they elected not to do so. The plaintiff was not required to enter into

a second contract to pay more money for the land; it voluntarily (from the legal standpoint) chose so to act after considering all the elements that then existed, including the pressure of time.

In *Leeper* v. *Beltrami*, 53 Cal.2d 195, 203 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803], it is pointed out that duress in modern law may consist of threats to business or property interests under some conditions and circumstances. (*Sistrom* v. *Anderson*, 51 Cal.App.2d 213, 220-221 [124 P.2d 372]; Rest., Contracts, § 493; *Young* v. *Hoagland*, 212 Cal. 426 430-431 [208 P. 996, 75 A.L.R. 654]; *Thompson Crane & Trucking Co.* v. *Eyman*, 123 Cal.App.2d 904, 910-911 [267 P.2d 1043].)

It is not duress, however, to take a different view of contract rights, even though mistaken, from that of the other contracting party, and it is not duress to refuse, in good faith, to proceed with a contract, even though such refusal might later be found to be wrong.

In 17 California Jurisprudence, Second Edition, Duress, etc., section 7, pages 78-79, it is said: "A mere threat to withhold a legal right for the enforcement of which a person has an adequate remedy is not duress. And since the definitions of duress and menace embrace the element of unlawfulness, it is not duress or menace to threaten nonperformance of a contract, to institute litigation, or otherwise to do what one has a legal right to do. Thus, one may with impunity threaten to foreclose an overdue mortgage, to levy execution on nonexempt property, though the supporting judgment be avoidable, or to repossess property sold under a conditional sales contract."

And in *Nesbitt Fruit Products, Inc.* v. *Del Monte Beverage Co.*, 177 Cal.App.2d 353, 361 [2 Cal.Rptr. 333], the general rule applicable here is thus stated:

"It is not duress or unlawful for a party to threaten to refuse to proceed under a contract nor to threaten to stand suit." (See also *Sistrom* v. *Anderson*, *supra*, 51 Cal.App.2d 213, 221; *Marshall* v. *Packard-Bell Co.*, 106 Cal.App.2d 770 [236 P.2d 201]; *Leeper* v. *Beltrami*, *supra*, 53 Cal.2d 195, 204; *Shell Oil Co.* v. *Cy Miller, Inc.*, 53 F.2d 74; *Texas Co.* v. *Todd*, 19 Cal.App.2d 174 [64 P.2d 1180].)

The trial court found generally in favor of the defendants, saying

"It is not true that any action taken by the defendants in connection with the final sale of any of the parcels above described was arbitrary, without just cause or excuse, or done

to bring economic damage to the plaintiff." The court found that the plaintiff was not damaged in the sum of $26,728.65 "by reason of anything done by the defendants in connection with the sale of said real estate," and that the defendants did not owe the plaintiff any sum as a consequence of the relationship of the parties. These findings are equivalent to a determination by the court that there was no duress or "business compulsion."

It is true that from the standpoint of the plaintiff which singlemindedly wished forthwith to complete a subdivision, with prospects, presumably, of large profits, there was a kind of necessity or compulsion to get things done immediately; as plaintiff was in business, the necessity might be termed a "business compulsion" within the common or every-day meaning of the words. ▅▅ While that would be one connotation in common usage, the words "business compulsion" have become a term of art as used in litigation in this state; from the legal standpoint "business compulsion" indicates the origination of a legal right based on "duress" within the meaning of the law, and there was no such showing by the plaintiff in this case. The plaintiff had the choice to bring suit for damages arising from a failure to perform the incomplete contract, which it had made originally and the fact that lawsuits take time and that it was clear that a resort to the courts would prevent the rapid completion of the subdivision is not equivalent to saying that there was a legal right to renegotiate a contract and then sue, after the event, for the difference between what the plaintiff would have preferred to pay for the land and what it later agreed to pay for it. There probably was never a sale of real property in which the buyer would not have preferred to pay less than he did. If the courts should begin to encourage suits like this one, land deals would never be final in this country.

The court may have been confused as to the connotation of the words "business compulsion" in paragraph XIII of the findings, when it said: "It is true that Robert H. Grant in renegotiating to obtain all parcels of the Korn property acted under business compulsion." By the use of the term, the trial judge may have meant to employ a common and nonlegal meaning of the words as above stated.

▅▅ The conclusion of the court below that defendants cannot be amerced in damages by reason of the renegotiated contract is sound. The evidence on this subject is not in conflict; considered as a whole it shows definitely that the final

agreement between the parties was not the result of duress, or, as it is sometimes called, "business compulsion." An amendment of the findings is necessary in connection with the affirmance of the judgment. (*Tupman* v. *Haberkern,* 208 Cal. 256 [280 P. 970] ; *Johndrow* v. *Thomas,* 31 Cal.2d 202, 207-208 [187 P.2d 681] ; *People* v. *Good,* 223 Cal.App.2d 298, 302 [35 Cal. Rptr. 825] ; *Strodel* v. *Wilcox,* 137 Cal.App.2d 781, 786 [291 P.2d 95] ; *Beyl* v. *Yasukochi,* 135 Cal.App.2d 638, 640-641 [287 P.2d 863] ; *Luce* v. *Sutton,* 115 Cal.App.2d 428, 434-435 [252 P.2d 352] ; *People* v. *One 1949 Ford Tudor Sedan,* 115 Cal. App.2d 157, 163 [251 P.2d 776] ; *Jud Whitehead Heater Co.* v. *Obler,* 111 Cal.App.2d 861, 875 [248 P.2d 608] ; *Hucke* v. *Kader,* 109 Cal.App.2d 224, 231 [240 P.2d 434] ; *Fitzsimmons* v. *Fitzsimmons,* 72 Cal.App.2d 545, 549 [164 P.2d 934] ; *Cleverdon* v. *Gray,* 62 Cal.App.2d 612, 620 [145 P.2d 95] ; *Klein* v. *Farmer,* 57 Cal.App.2d 542, 548 [135 P.2d 21] ; Cal. Const., art. VI, § 4¾ ; Code Civ. Proc., § 956a.) The findings are amended as follows :

The second paragraph of finding XIII (page 29, lines 8 to 10 of the clerk's transcript) is corrected by the insertion of the word "not" before the word "true" to read : "It is not true that Robert H. Grant in renegotiating to obtain all parcels of the Korn property acted under business compulsion."

The judgment is affirmed.

Brown (Gerald), P. J., and Whelan, J., concurred.

A petition for a rehearing was denied May 24, 1965, and appellant's petition for a hearing by the Supreme Court was denied June 30, 1965.