[Civ. No. 13662. Third Dist. July 15, 1974.]

U. S. HERTZ, INC., Plaintiff and Appellant, v.
NIOBRARA FARMS et al., Defendants and Respondents.

## COUNSEL

Arata, Misuraca, Clement & Haley, Arata, Misuraca & Clement, Malcolm Misuraca, John R. Hetland and Thiel, Bolton & Cornblum for Plaintiff and Appellant.

Landels, Ripley & Diamond, Edgar Washburn, Crowe, Mitchell & Crowe, J. Thomas Crowe, and Laughlin, Pugh & McGlynn, Craig & Christensen for Defendants and Respondents.

## OPINION

**GOLDSTEIN, J.**[*]—Plaintiffs U. S. Hertz, Inc. (herein "Hertz") appeals from an order dissolving a temporary restraining order and denying its motion for a preliminary injunction. Such an order is appealable. (Code Civ. Proc., § 904.1, subd. (f).)

### Facts

On July 1, 1971, plaintiff submitted to defendants an offer in writing entitled "Real Estate Purchase Contract and Receipt for Deposit" wherein it offered to purchase from defendant Niobrara Farms (herein "Niobrara") 1,150 acres of improved agricultural land located in Butte and Tehama Counties. The greater part of the land was owned by Niobrara, the remainder by defendants Dobson who were relatives of the owner of Niobrara.

---

[*]Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Included in the purchase price of $3,115,000 were farming equipment and an irrigation system and certain interests in Sunsweet Dryers and an almond hulling association. The purchase price of all the foregoing assets was to be paid as follows: Cash—$2,815,000; a promissory note in the sum of $300,000 secured by a deed of trust on the real property. The offer was accepted in writing by Niobrara.

Performance of the contract was *contingent* on the obtaining by *Hertz* of acceptable financing within 45 days after the acceptance of the offer by Niobrara. The time within which Hertz was required to obtain the financing was extended in writing to September 15, 1971.

Hertz was unable to obtain sufficient financing to make the cash payment of $2,815,000 on September 15, 1971. The agreed closing date for the transaction, namely September 30, 1971, expired without its consummation.

In October 1971, Armand Monlux, a real estate broker with offices in Chico, California, several representatives of Niobrara, a representative of Midland Title Company and Niobrara's attorney Thomas Crowe, met at Crowe's office in Visalia, California. Hertz was not represented at the meeting. After a discussion, Crowe prepared escrow instructions to be delivered to Midland Title Company for the sale of the real property described in the original contract. The escrow instructions differed materially and substantially from the provisions in the original contract.

Thereafter, negotiations were resumed between Hertz and Niobrara and defendants Dobson for the sale of the property. On November 9, 1971, the parties agreed on the final terms of an escrow agreement specifying in detail the terms and conditions under which title to the real property and specifically described items of personal property would be transferred by Niobrara and the Dobsons to Hertz. The escrow was closed on November 19, 1971, at which time duplicate originals of the deeds and deeds of trust hereinafter described were recorded in both Butte and Tehama Counties

*Dissimilarities Between the Original Contract (Herein "Contract")*
*and the Escrow Agreement (Herein "Escrow")*

The base purchase price of the real property and personal property, to-wit: $3,115,000, remained unchanged. However, as a result of prorations, modifications, adjustments and compromise, the total consideration was increased to the sum of $3,287,275.88, including title and recording costs.

The material differences were as follows:

1. (a) The contract contemplated a sale to Hertz of all the real and personal property for $3,115,000 as a single unit. (b) Under the escrow Niobrara sold all real property in Butte County and a portion of the real property in Tehama County together with all personal property, particularly described in a bill of sale deposited in escrow for $2,565,000. The Dobsons sold the remaining real property in Tehama County for $550,000.

2. (a) The contract provided for a cash payment of $2,815,000 and a promissory note payable to Niobrara in the sum of $300,000 secured by a deed of trust on the real property. (b) The escrow provided for delivery to Niobrara of a promissory note for $602,000, an additional promissory note to the Dobsons[1] for $163,000, each secured by individual deeds of trust subordinate to a first deed of trust in favor of Prudential Life Insurance Company (herein "Prudential"), securing a promissory note in the sum of $2,150,000. The balance of the purchase price was payable in cash.

3. (a) The contract provided that 1,000 shares of Sunsweet Drying rights and Niobrara's interest in a hulling association were to be transferred to Hertz. (b) Under the escrow, Hertz was to receive 2,000 shares of Sunsweet rights, but was required to assume an indebtedness thereon, evidenced by two promissory notes in favor of Sunsweet in the sum of $60,000. Niobrara was to retain the interest in the North State Hulling rights subject to a credit to Hertz on the purchase price of $4,050.

4. (a) The contract provided that Niobrara was to be reimbursed by Hertz at the close of escrow for all its cultivating and harvesting expenses incurred by Niobrara after the acceptance of the contract by Hertz. The actual amount of the reimbursement was left for future determination. (b) The escrow provided that Hertz would pay to Niobrara for its accrued cultivating costs the agreed sum of $150,000.

5. (a) The contract provided that all crops growing or to be grown on the property were included in the sale and that, upon the acceptance of the contract, the parties would agree on the method of harvesting said crops. (b) The escrow provided that the crops, *as of July 1, 1971,* were included in the sale to Hertz and were included in the sales price, and that Hertz was to receive the crops or the proceeds of the marketing thereof; and that Hertz was to reimburse Niobrara the aforesaid agreed sum of $150,000 for its cultivating costs incurred in the care of such crops. The provision in the

---

[1] Jerome Dobson, Bridget Dobson, his wife, Edward B. Dobson, Lynn Banister Dobson, his wife (herein "the Dobsons").

contract that the parties would thereafter agree on the method of harvesting does not appear in the escrow.

6. (a) The contract provided that all equipment on the property was included in the sale, and that a detailed inventory of said equipment would be provided to Hertz upon acceptance of the contract. (b) The escrow provided that a detailed bill of sale specifying all items of personal property included in the sale and to be transferred to Hertz was deposited with the escrowee by Niobrara concurrently with Niobrara's signed escrow instructions.

7. (a) The contract described Hertz as a real estate broker buying for its own account. (b) The escrow refers to Hertz as the buyer, without any additional designation. Undisputed evidence at the hearings revealed, however, that Hertz received from the broker who negotiated the sale one-fourth of the latter's total commission of $150,000.

The first installment of $244,200 in principal, together with accrued interest on the Niobrara note, became due on December 20, 1971. On March 20, 1972, a second installment in the same sum with accrued interest became due. Neither of the installments or the accrued interest thereon has been paid. The record shows that the payments due on the note secured by the first deed of trust to Prudential Insurance Company and on the Dobsons' note are not in default.

On February 8, 1972, Niobrara recorded concurrently in the offices of the County Recorders of Tehama and Butte Counties notices of default and election to sell the trust property to satisfy the indebtedness secured by Niobrara's deed of trust. Such notices alleged that Hertz had failed to make the payments of principal and interest due on December 21, 1972, on the note executed by Hertz.

### Proceedings in the Trial Court and This Court

On May 2, 1972, plaintiff filed the within action. (Hereinafter we discuss in extenso the allegations in the complaint.) Hertz in its complaint sought a permanent injunction restraining all defendants from proceeding with the foreclosure of the trust property. Concurrently with the filing of the complaint Hertz filed a petition for a preliminary injunction restraining defendants from proceeding with the foreclosure pending the determination of the injunction action. On May 5, 1972, a preliminary restraining order was issued by the trial court.

Hearings were held on the motion for a preliminary injunction on June 16, 1972, and August 7, 1972. On the latter date, the trial court denied

plaintiff's motion for such injunction, said order to become effective on August 18, 1972. The prior temporary stay of the foreclosure proceedings was later extended to August 31, 1972, on condition that an additional surety bond be filed by plaintiff. The bond was filed.

On August 30, 1972, plaintiffs applied to this court for a further stay of the foreclosure proceedings. We granted a stay pending the filing by defendants of their points and authorities in opposition to plaintiff's petition for such stay of the foreclosure pending the determination of plaintiff's appeal from the order of denial of the trial court, on condition that a surety bond, cash or certificate of deposit in the sum of $250,000 be filed with the County Clerk of Tehama County. In compliance with such order, a certificate of deposit in that sum was deposited by plaintiff. On September 7, 1972, we extended the stay until the determination of this appeal on condition that the security in said bond be increased to $500,000. Plaintiff has complied with the foregoing order by filing an additional certificate of deposit in the sum of $250,000 with the Clerk of Tehama County.

## The Pleadings

By its complaint, plaintiff seeks compensatory damages from defendants, except North American Title Insurance Company (herein "North American"). It also seeks a permanent injunction against all defendants staying them from proceeding with the foreclosure. Rescission of the purchase of the real and personal property is not sought by plaintiff.

The gravamen of the complaint is allegations of various fraudulent representations by all defendants except North American. Hertz alleges it relied on such representations in consummating the transaction. Plaintiff seeks no damages from North American; injunctive relief only is sought against North American restraining the foreclosure proceedings.

The complaint charges defendants (except North American) with five separate and distinct acts of fraud which are discussed later in this opinion.

Plaintiff's complaint is not a model of good pleading. It would appear, however, that it bases its case on the original contract for the purchase of the property. A copy of the contract is attached to the complaint as an exhibit. Hertz alleges that the purchase was consummated through an escrow established with North American. None of the terms of the escrow are alleged, although a copy of the escrow closing statement showing credits, debits and the total consideration is attached to the complaint as an

exhibit. Nowhere in the complaint does there appear any reference to the substantial and material differences between the contract and the escrow.

Defendants deny that the property was sold pursuant to the aforesaid contract, but on the contrary, allege that the transaction was consummated according to the terms and conditions set forth in the escrow, including the documents delivered by defendants Niobrara and the Dobsons to North American pursuant to such escrow. None of the pleadings have been amended.

## The Issues

Central to the determination of this litigation is a discussion of the following issues:

1. Whether the true contract between the parties was evidenced by the original contract or the escrow. Closely allied with that issue is the question as to whether or not the original contract has been abandoned and in its place the parties negotiated a different agreement evidenced by the escrow.

2. Did the trial court abuse its discretion in denying plaintiff's motion for a preliminary injunction?

3. Did Hertz sustain the burden of proving that it purchased the property in reliance on false and fraudulent representations by defendants Niobrara and the Dobsons? Additional issues relating to the form and recording of instruments and documents which are relevant to the determination of this appeal are hereinafter discussed.

## The Law

1. ██ The original contract was abandoned and the sale was consummated pursuant to escrow instructions thereafter filed with North American.

The original contract provided that *time was of the essence.* Hertz agreed by that contract to make a cash payment of $2,815,000 not later than August 15, 1971. By addendum to the contract, its time to make such payment was extended to September 15, 1971. It endeavored to fund the down payment by means of a first deed of trust securing a note in favor of Prudential in an amount equal to the down payment of $2,815,000. Prudential declined to make a loan in that sum but limited its loan to the sum of $2,115,000. The contract provided that *consummation* of the *transaction was contingent* on the *obtaining* by Hertz of the necessary financing

on or before September 15, 1971. Hertz was unable to raise the down payment within the time limited by the contract. The agreed prescribed closing date, namely September 30, 1971, passed. Hertz makes no claim that it was able to or offered to perform the contract according to its terms at any time prior to the expiration of the time limited by the contract.

In *Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19 [142 P.2d 22], the court states the applicable rule at page 27: "[W]hen time is made of the essence of a contract, a failure to perform within the time specified is a material breach of the contract."

It is clear that the contract terminated when Hertz failed to meet the condition requiring it to raise the cash payment on September 15, 1971. Later developments buttress the foregoing conclusion.

In the middle of October 1971, a real estate broker named Armand Monlux called upon Niobrara's attorney, J. Thomas Crowe of Visalia, California. He was accompanied by a representative of North American and one of the Dobsons. It was apparent that unless the financial arrangements were materially and extensively recast, Hertz would be unable to negotiate the purchase of the property. Crowe prepared new and essentially different terms for the sale of the property to Hertz. They furnished the basis for further negotiations between Hertz, Niobrara and the Dobsons. Thereafter, representatives of the parties renewed the negotiations for the sale of the property. The negotiations culminated on November 9, 1971, in an agreement evidenced by written escrow instructions deposited by Niobrara with North American accompanied by various supporting documents. The escrow instructions were approved and accepted in writing by U. S. Harrington, vice-president of Hertz, on the same day. Seymour Hertz testified at the hearing in the trial court that Harrington was authorized to assume obligations on behalf of plaintiff. On November 17, 1971, North American recorded the deeds and deeds of trust relating to the transaction with the county recorders of Butte and Tehama Counties as required by the escrow. The closing statement attached to plaintiff's complaint embodies all charges and credits involved in the transaction. All the entries in the closing statement correspond to the escrow instructions. The escrow and the closing statement differ materially from the original contract. The basic dissimilarities between the original contract and the escrow instructions are discussed earlier in this opinion.

We agree with defendant's contention that the original contract was completely abandoned by mutual consent of the parties, and that the true agreement between the parties is evidenced solely by the escrow.

2. and 3. ■ The question as to whether the trial court abused its discretion in denying plaintiff's motion for a preliminary injunction is interrelated with the question as to whether Hertz made a sufficient showing of fraud at the hearing in that court. Therefore, we consider them together.

■ It is hornbook law that the granting or denial of a preliminary injunction rests in the sound discretion of the trial court. It is also well established that the powers of a reviewing court are limited. We may not weigh the evidence or conflicts therein. Our concern is directed solely to the question of whether a showing is made of an abuse of discretion by the trial court. (*Weingand* v. *Atlantic Sav. & Loan Assn.* (1970) 1 Cal.3d 806, 820 [83 Cal.Rptr. 650, 464 P.2d 106].)

■ Generally, a preliminary injunction does not involve the ultimate adjudication of the rights of the parties. Its purpose is to preserve upon a proper showing the status quo until the final determination of the action. ■ In making a determination of whether a proper showing is made, the trial court must consider the following: will a greater injury result to the defendant from granting the injunction than to the plaintiff from refusing it? Is there a reasonable probability that the plaintiff will ultimately prevail? (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512 [67 Cal. Rptr. 761, 439 P.2d 889].)

■ At the two hearings held in the trial court, Hertz offered no witnesses in its behalf. At the opening of the trial, it rested its case on the complaint, a brief supporting affidavit of Seymour Hertz, and a more detailed affidavit of U. S. Harrington.

Defendants called Seymour Hertz as an adverse witness. (Evid. Code, § 776.) Although he had verified the complaint, he admitted that he had never discussed the terms of the sale or the alleged misrepresentations with any of the defendants prior to the sale; he had no personal knowledge of the charges of fraud and misrepresentation alleged in the complaint; all his information relating thereto had come from Harrington.

Harrington was then called by defendants as an adverse witness under Evidence Code section 776. Documentary evidence was offered by both sides during his examination and that of two other witnesses called by defendants. A detailed review of the testimony and written evidence would serve little useful purpose. There were conflicts in the testimony. It is clear that the trial court, weighing the evidence as a whole, concluded that plaintiff had failed to establish its right to injunctive relief. The evi-

dence, in several important respects, failed to support Hertz's allegations of fraud and misrepresentations as can be seen from the following:

1. Hertz charged in the complaint that the beneficial shares of Sunsweet Dryers were represented to be free from encumbrances. This contention was completely repudiated by the terms of the escrow which specifically provided that as a condition to acquiring the Sunsweet shares, *Hertz agreed to assume and discharge an indebtedness to Sunsweet* against such shares in the sum of $60,000.

2. Hertz charged in the complaint that the cultivating costs were to be prorated and that the defendants represented that the obligation of Hertz as a result of such proration would not exceed $100,000. The escrow made no provision for such proration. On the contrary, the escrow stated *specifically* and *clearly* that *Hertz would be charged with cultivating costs in the sum of $150,000.* In the closing statement Hertz is debited with this sum as a charge against it. Harrington's explanation for agreeing to the charge of $150,000 was that *he had no other choice.* He explained that the expenses Hertz had incurred in the prior negotiations relating to the contract left him with no choice but to accept the terms of the escrow. In plaintiff's brief this is described as "business duress" which we discuss hereinafter. In urging that it was left with no choice, Hertz overlooks the obvious choice open to Hertz to reject the proposed escrow and accept whatever loss it incurred in the futile attempt to obtain the loan from Prudential as a business expense. Its acceptance of the escrow was a free and voluntary act.

3. Hertz alleged that defendants misrepresented the amount of farm machinery and equipment to be included in the sale, and that there was a deficiency of approximately $15,000 in the value of the farm equipment and machinery received by Hertz. The fact is that Niobrara *deposited with the instructions approved by Harrington, a bill of sale itemizing in detail the farm equipment and machinery to be acquired by Hertz.* Harrington made no claim that any of the items described in the bill of sale were not delivered to Hertz. His only excuse for agreeing to accept the bill of sale in the form deposited in escrow was a reiteration of his previous claim that he had no choice.

4. and 5. Hertz charged that the value of the almond and prune crops received by Hertz was overstated and misrepresented. The evidence was in conflict as to these items, but a strong showing was made by defendants, supported by documentary evidence, that the amount for which defendants were credited on account of the purchase price by reason of their

retention of the proceeds of the almond crop closely approximated the amount actually received by them. As to the prune crop, there was evidence that Hertz received in cash and revolving funds more than three times the amount alleged by Hertz to be the actual value of the crop.

### There Was No Evidence of Duress

In its brief on appeal plaintiff asserts: "Hertz agreed to close escrow on the terms demanded on the Sunsweet stock and without an appropriate inventory or knowledge of the ranch equipment, because by the time Niobrara added duress to the transaction the Prudential loan was ready to fund. U. S. Harrington, the executive vice-president of Hertz, testified that aside from the loss of the points already paid to Prudential, Hertz's credit rating and ability to secure financing from Prudential and others would be impaired by withdrawing from the transaction, i.e., by declining the committed $2,150,000 for which it had asked."

It may be observed that nowhere in the pleadings is there any allegation that Hertz approved and accepted defendant's escrow instructions by reason of duress.

There is no showing in the evidence of any tortious conduct on defendants' part. Civil Code section 1569 defines duress as the unlawful detention of a person; the unlawful detention of his property; or the confinement of a person, lawful in form, but fraudulently obtained or fraudulently made unjustly harassing or oppressive. ▉ A form of duress described variously as "business" and "economic" duress has been recognized in decisional law. It exists when *threats to business or property* interests by the use of *coercion* and/or *wrongful compulsion* are present. It is essentially tortious in nature. (*Thompson Crane & Trucking Co.* v. *Eyman* (1954) 123 Cal.App.2d 904, 908-909 [267 P.2d 1043].)

In *London Homes, Inc.* v. *Korn* (1965) 234 Cal.App.2d 233 [44 Cal. Rptr. 262], the court limited the definition of economic and business duress as follows at page 240: " '. . . And since the definitions of duress and menace embrace the element of unlawfulness, it is not duress or menace to threaten nonperformance of a contract, to institute litigation, or otherwise to do what one has a legal right to do. . . .' "

▉ The facts here do not support the claim of duress. Hertz abandoned the original contract because it was unable to raise the necessary cash to consummate the transaction. There is no showing that Prudential declined to make a commitment in excess of $2,115,000 by reason of tortious or wrongful conduct or persuasion on defendant's part. Hertz

made no such claim at the hearings or in its brief on appeal. When it was unable to consummate the transaction on the original terms, Hertz was presented with two options. It could abandon the purchase and take as a loss whatever expense it had incurred in attempting to purchase the property on the initial terms. Such painful consequences are often sequel to disappointed hopes and expectations. On the other hand, it could agree to renegotiate the purchase on more viable terms. It chose the latter course. This was a business judgment arrived at voluntarily and freely. Hertz has made no showing of duress.

The trial court's denial of Hertz's motion for a preliminary injunction is amply supported by the evidence. We find no abuse of discretion on the part of the trial court.

### Plaintiff's Contentions That There Were Defects in the Substitution of the Trustee and the Notices of Default Are Without Merit

Niobrara's note for $602,000 was secured by *two* deeds of trust. This resulted from the fact that the property sold by Niobrara to Hertz was situated in both Butte and Tehama Counties. Each of the deeds of trust described real property situated only in the county in which it was recorded.

On February 1, 1972, Niobrara executed two forms of substitution of trustees. In each substitution, Title Insurance and Trust Company (herein "Title Insurance") was substituted as trustee in place of North American. One of the substitutions was recorded in Butte County, the other in Tehama County.

On February 1, 1972, Niobrara executed separate notices of default and election to sell the properties secured by the respective deeds of trust to satisfy the obligations secured thereby. The notices were recorded on February 8, 1972, in the respective Counties of Butte and Tehama.

1. Hertz contends that the substitutions of the trustee were defective because they bear no acknowledgment by North American that it had received a copy of the notice of substitution prior to recording or proof by affidavit that a copy of said substitution had been served on North American prior to recording.

2. Hertz further contends that the substitution of Title Insurance in place of North American was recorded in Tehama County *after* the notice of default had already been recorded and was therefore defective because the trustee of record at the moment of such recording was North American, not Title Insurance.

3. Finally, Hertz contends that both notices of default were defective because they were not acknowledged before a notary public prior to recording.

None of the foregoing claims of error was raised in the trial court. They were not the subject of any evidence. They are urged for the first time on appeal.

In *In re Hochberg* (1970) 2 Cal.3d 870, the court held at page 875 [87 Cal.Rptr. 681, 471 P.2d 1]: " 'It is elementary that the function of an appellate court, in reviewing a trial court judgment on direct appeal, is limited to a consideration of matters contained in the record of trial proceedings, and that "Matters not presented by the record cannot be considered on the suggestion of counsel in the briefs." ' [Citation.]"

A similar ruling was made in *Oldenkott v. American Electric, Inc.* (1971) 14 Cal.App.3d 198, where the court stated at page 207 [92 Cal. Rptr. 127]: "In reaching a decision on appeal an appellate court is governed by the record; will not consider facts having no support in the record; and will disregard statements of such facts set forth in a brief. [Citations.] The facts heretofore outlined respecting the alleged invalidity of plaintiff's patents are the product solely of appellant's 'Additional Brief' [fn.]; are not supported by any evidence or showing in the record; and may not be considered by this court as a basis for reversal."

Had such issues been raised in the trial court, Hertz could not have prevailed thereon. We discuss them in turn.

1. ▮ *As to the contention that there is no proof that North American had notice of the substitution of Title Insurance before the notice was recorded:* Section 2934a of the Civil Code provides that, when recorded, substitution of a trustee must contain an acknowledgment of service of a copy thereof by the trustee named in the deed of trust or, in the alternative, there must be attached thereto an affidavit with proof of such service on such named trustee. The recorded substitutions do not comply with the statute in either respect. It does not follow, however, that the substitutions are defective or invalid.

Each of the deeds of trust contained the following identical provision: "Beneficiary, or any successor in ownership of any indebtedness secured hereby, *may from time to time,* by instrument in writing, *substitute* a successor or successors to any Trustee named herein or acting hereunder, which *instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder* of the county or counties where said property is situated, *shall be conclusive proof of proper substitution of*

*such successor* Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee." (Italics added.)

The recorded substitutions comply both in form and substance with the foregoing quoted provisions of the trust deed.

The remaining question is whether parties to a deed of trust may agree to a form of notice of substitution of trustee which does not comply with the statutory form of such substitution. The decisions leave no doubt that parties may lawfully contract as to the form of and procedure to be employed in effecting such substitution.

In *Bennett* v. *Ukiah Fair Assn.* (1936) 7 Cal.2d 43 [59 P.2d 805], the court held that a provision similar to that above quoted from the within deeds of trust empowered the beneficiary to substitute the trustee in the manner provided in the deed of trust. The court held at page 45: "The general rule as to the right of a beneficiary to substitute a trustee is well expressed in 41 Corpus Juris, at page 379: " '. . . However, where the power is conferred upon the beneficiary, his successor or assigns, or other legal representatives, no personal discretion is confided in any particular person, but the power may be exercised by any holder or owner of the deed of trust.' "

In *Jensen* v. *Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 794 [345 P.2d 1], the Supreme Court states the applicable rule as follows: " 'While contracts opposed to morality or law should not be allowed to show themselves in courts of justice, yet public policy requires and encourages the making of contracts by competent parties upon all valid and lawful considerations, and courts so recognizing have *allowed parties the widest latitude in this regard*; and, unless *it is entirely plain that a contract is violative of sound public policy, a court will never so declare.* "The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." [Citation.]' " (Italics added.)

Further in the same opinion the court stated at page 795: " 'Parties to a contract may contract *on such method of giving notice as they desire* and unless public policy is contravened, the contract should be enforced as made.' " (Italics added.)

 Of special significance is the fact that *North American itself prepared* the forms of deed of trust. Had it desired notice of substitution prior to recording, it could readily have inserted in the deed of trust an appropriate provision requiring such notice. It chose not to do so. No question of public policy or morals is here involved.

Moreover, Hertz is in no position to complain. Its rights are in no manner affected by the absence of notice to North American of the substitution of the trustee. The statute gives the beneficiary the *absolute right* to *substitute a trustee* in the *place* of the *one* named in the *deed of trust.* Hertz's contention relates to form, not substance. So far as it was concerned, it mattered not at all (nor did it have any choice) as to whether North American or Title Insurance was to continue to remain as the trustee under the deed of trust.

2. The record shows that the *substitution* was *recorded* in Tehama County *one minute after* the *recording* of the *notice* of *default.* Hertz contends that this is a fatal defect and creates a "clear break in the chain of title." The law supports no such contention. It appears from both documents that they were executed on the same day and thereafter recorded on the same day.

Hertz misconstrues the underlying purpose served by the recording of such documents. They grant no interest in real property. Their main objective is notice to innocent prospective purchasers or encumbrancers of outstanding asserted rights or interests in the real property described in the notice that may affect or impair the rights of such prospective purchasers or encumbrancers. (*City of Los Angeles* v. *Morgan* (1951) 105 Cal.App.2d 726 [234 P.2d 319].)

No bona fide purchasers or encumbrancers are here involved. This controversy involves only Hertz and the defendants. Hertz makes no showing that any of its rights were prejudiced or impaired by the one minute differential between the recording of the substitution and the notice of default. That it received timely notice of the notice of default is evidenced by the fact that it filed the instant action. *Even an unrecorded instrument is valid as between the parties thereto and those who have notice thereof.* (Civ. Code, § 1217.)

3. *As to the contention that the notices of default are invalid because of the lack of notarial acknowledgment*: Civil Code section 2924 prescribes the essential factual data that must be included in a notice of default. Hertz does not contend that the notices omitted any of such data. It insists, however, that the notices of default and election to sell bore

no notarial acknowledgment. A ready answer to this contention arises from the fact that Civil Code section 2924 *does not require* that the *notice of default* be *acknowledged* before a notary public.

Government Code section 27287 designates the "instruments" that require acknowledgment prior to recordation. Neither "documents" nor notices of default are included in that section. The long-established practice of recording unacknowledged notices of default is a matter of common knowledge. In laymen's nomenclature the words "instrument" and "document" are frequently used interchangeably. (Webster's New Internat. Dict. (3d ed. 1961) p. 1172.) The courts, however, have recognized that there is a distinction between the legal meaning and significance of an "instrument" and a "document." Such distinction was drawn in *Hoag* v. *Howard* (1880) 55 Cal. 564, 565, where the court stated: "If we look into the provisions of the Code in which the word '*instrument*' is used, it will be invariably found to indicate some *written paper or instrument* signed and delivered by one person to another, *transferring the title to or creating a lien on property, or giving a right to a debt or duty.*" (Italics added.)

In *Weisbrod* v. *Weisbrod* (1938) 27 Cal.App.2d 712, 719-720 [81 P.2d 633], the court made it clear that the term "instrument" is not all-inclusive: " 'Generally, the term "instrument" as applied to documents necessarily imports a paper writing; but every paper writing is not necessarily an instrument within the settled statutory meaning of the term. With reference to writings the term "instrument" as employed in our statutes has been defined to mean an agreement expressed in writing, signed and delivered by one person to another, transferring the title to or creating a lien on real property, or giving a right to a debt or duty.' " (See, to the same effect, Ogden, Cal. Real Property Laws, § 8.14, p. 325.)

The recording of a notice of default *confers no rights*. It serves *only* as to notice to the world, the trustee and the trustor that the beneficiary asserts that there has been a default on the part of the trustor in complying with his obligations under the deed of trust. It also limits the time within which the default may be remedied by the trustor and within which the beneficiary may commence foreclosure proceedings. It does nothing more. No showing has been made by Hertz that he has suffered any prejudice or impairment of rights because the notice of default was not acknowledged. The recorder did not require an acknowledgment as a condition to recording. We find no merit in the foregoing contention.

3. ▮▮▮ *Hertz additionally complains that the use of extrajudicial foreclosure procedures is unconstitutional and violative of the Fourteenth Amendment to the United States Constitution.*

In considering such contention, two matters must be considered: (1) Is there an element of state action present which brings the extrajudicial foreclosure within the Fourteenth Amendment? (2) If the Fourteenth Amendment is applicable, has Hertz been denied due process?

Hertz relies on a long line of cases involving the seizure of personal property without notice, among them *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820]; *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983]; *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13]; *Brooks* v. *Small Claims Court* (1973) 8 Cal.3d 661 [105 Cal. Rptr. 785, 504 P.2d 1249].) In each of the cases relied on, the property of the aggrieved party had been seized through the intervention of some form of governmental action or authority. Here, the state will not and does not participate in any way in the sale of the property under foreclosure. It is accomplished entirely pursuant to procedures agreed upon in advance by the parties. No question of due process is involved.

Both of the grounds urged by Hertz are answered in *Strutt* v. *Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866 [105 Cal.Rptr. 395], in a nonjudicial foreclosure where a similar contention was raised. The court there held at pages 876-877: "In view of the foregoing, it is dubious whether any further discussion of plaintiff's contentions concerning the constitutionality of Civil Code, section 2924 is warranted. However, we are constrained to say that, in any event, we find them unmeritorious. Ignoring the proposition that the constitutional guarantees of due process and equal protection of laws apply only to state, as opposed to private, conduct and the troublesome problems that proposition would present in respect to Civil Code, section 2924 [citations], particularly in view of the fact that Civil Code, section 2924 *is not* an *enabling* or *authorizing statute at all* but, rather, a statute restricting and limiting the exercise of private powers of sale for the benefit of debtors (see *Smith* v. *Allen,* 68 Cal.2d 93, 96 . . .), the answer to the contention based on *Sniadach, Fuentes, Blair, Randone* and *Adams,* is apparent. Under the provisions of Civil Code, section 2924, there is no immediate seizure of the property nor any immediate impairment of the debtor's rights in respect to the property. He is given *by the statute a minimum of 90 days* in which *he can refinance or sell the property* or, more to the point, *if he disputes* the facts set forth in the *notice of default,* or has some legal or equitable defense to foreclosure, he may within the statutory period institute *an action to enjoin the sale* and thereby obtain the judicial hearing contemplated by the cases cited." (Italics added.)

Here, too, Hertz has availed itself of the identical remedy employed by the appellant in *Strutt*, namely, the filing of an action for an injunction to restrain the foreclosure sale. None of its property has been seized. In fact, although two years have elapsed since the first steps to foreclose its deed of trust were taken by Niobrara, Hertz still remains in possession of the real property described in the deed of trust. It continues to enjoy the use of that property and the income therefrom. We find no merit in the claim of unconstitutionality urged by Hertz.

One final matter requires discussion. Hertz correctly complains that both foreclosure sales were advertised to be held in Tehama and Butte Counties on the same date and hour. During the argument of the appeal, counsel for Niobrara advised the court that the sales had been continued to and will be held at different times.

The order denying the motion for a preliminary injunction is affirmed with costs to respondents. The stay of the foreclosure proceedings heretofore issued by this court is vacated and annulled.

Richardson, P. J., and Regan, J., concurred.