XEROX CORPORATION, a New York corporation, Plaintiff-Appellee,

v.

ISC CORPORATION, a Colorado corporation, and Harold Tamblyn, Defendants-Appellants,

and

Applied Computer Timesharing, a limited partnership, Intervening Defendant.

No. 78–1040.

Colorado Court of Appeals, Div. I.

April 9, 1981.

Rehearing Denied June 4, 1981.

Holland & Hart, Harry L. Hobson, Gregory A. Eurich, Hugh Q. Gottschalk, Denver, for plaintiff-appellee.

Inman & Flynn, P.C., Robert D. Inman, H. Christopher Clark, Denver, for defendants-appellants.

STERNBERG, Judge.

Defendant ISC Corporation appeals a judgment entered against it following a jury trial. Defendant Harold N. Tamblyn, president of ISC, appeals a judgment notwithstanding the verdict entered against him. Plaintiff Xerox Corporation cross-appeals, seeking reversal of the trial court's denial of its motion for judgment notwithstanding the verdict. We affirm.

On October 19, 1971, Xerox agreed to sell certain computer software to ISC. Shortly thereafter, ISC contracted for use of a Xerox computer from a third party, EDCON Corporation, to run its programs.

The system was to have been operational by January 12, 1972, but delays were encountered. After the delivery date was missed, the parties became engaged in a dispute regarding Xerox' late delivery and performance. The software was finally delivered on May 16, 1972.

On May 19, 1972, Xerox cancelled its computer lease with EDCON allegedly because of non-payment of rent. ISC then had no access to the computer. The parties entered into a settlement agreement on May 26, 1972. ISC was given possession of the equipment previously leased to EDCON. ISC executed four promissory notes for $2,638 each, dated on the first day of each month from July to October 1972, and due one year later. These notes represented monthly lease payments of $2,000 plus $638 installments against money due under the software agreement, which had called for cash payment. The settlement agreement also provided for ISC to release all claims arising out of the software agreement, except those based on warranty. ISC signed this release on September 27, 1972, after additional negotiations on certain terms.

Xerox subsequently filed suit against ISC when ISC failed to pay the notes as they came due, seeking possession of the equipment and damages. It also sued Tamblyn on the theory that he was the alter ego of ISC and, therefore, personally liable on the contract and on the basis of his personal guarantee of the promissory notes.

ISC asserted that the software had never worked according to specifications and defended on the basis that Xerox breached the contract and fraudulently concealed information concerning its ability to perform. It counterclaimed for damages.

After a trial by jury, judgments were entered on both the claim and counterclaim. The jury returned a verdict against ISC in the amount of $106,970.19. Although a verdict of "0" was returned against Tamblyn personally, on a motion for a judgment notwithstanding the verdict, the trial court entered judgment against him on the promissory notes in the amount of $10,552, plus interest. The verdict returned against Xerox was $97,500.

## I. *Fraudulent Concealment*

ISC asserts that the trial court committed reversible error in not instructing the jury on its theory of fraudulent concealment. We disagree.

ISC's basic factual contention is that it contracted for the purchase of the software in reliance on Xerox's representation that the system was capable of expanding to communicate with 20 simultaneous users ("20-line capacity") and incorporating "reverse channel capability," a feature supposedly required to insure confidentiality of user information. It asserts that after the contract was executed, Xerox discovered that it could not deliver these features, and concealed this information in an effort to expedite settlement with ISC. ISC argues that it would not have entered into the settlement agreement and release had it known Xerox could not provide 20-line capacity and reverse channel capability.

To establish its claim of fraudulent concealment, ISC introduced into evidence certain documents executed after the software agreement was signed and before the settlement agreement was reached. They indicate that when Xerox told ISC it could furnish a system meeting its requirements, this representation was made with the understanding that reverse channel capability was immediately available when, in fact, it was still in prototype form. They also reveal that achievement of 20-line capacity was "impossible." The documents indicate that Xerox set out to demonstrate at least partial operating success to ISC in an effort to encourage ISC to accept less than it had originally contracted to receive. According to Xerox, "the major difference between the present contract requirements and the new statement of work are . . . deletion of reverse channel capability . . . and reduction of the number of lines to six." ISC cites this statement, attributed to a Xerox technical employee, as proof that Xerox was contractually obligated to deliver these features.

The only reference to 20-line capacity in the software agreement is in "Expansion Proposals," incorporated by reference into the agreement. These documents state that the "computer system represents the necessary equipment and software needed to support six (6) communication lines . . . . Expansion from this initial configuration can be accomplished in a straightforward modular fashion." Each was accompanied by a cover letter which said: "This document does not constitute a proposal or commitment on behalf of [Xerox] but rather explores various avenues of system expansion and cost considerations for long-range planning."

Moreover, the software agreement makes no reference to reverse channel capability. However, several witnesses testified regarding reverse channel capability. A witness for Xerox testified that system security is a standard in the time-sharing computer system, the system was expected to function without confidentiality problems, and, in his discussions with Tamblyn, the need for confidentiality was covered "possibly" with reference to reverse channel capability. Tamblyn's son, an employee of ISC, testified that when he told Xerox that ISC was experiencing confidentiality problems, allegedly because the system Xerox designed could not discern when a user had disconnected a terminal, he was told this "might" have something to do with the reverse channel problem. Whether it was Xerox's responsibility to remedy this problem was disputed.

Based on the evidence before it, the trial court concluded that there was insufficient evidence for ISC's tendered instruction on fraudulent concealment to be submitted to the jury. We agree.

A party is entitled to a theory of the case instruction when it is supported by competent evidence. *See Federal Insurance Co. v. Public Service Co.*, 194 Colo. 107, 570 P.2d 239 (1977). Because ISC did not establish every element of fraudulent concealment, rejection of this theory of the case instruction was not error.

The elements of fraudulent concealment are (a) the concealment of a material existing fact which in equity and good conscience should be disclosed; (b) knowledge that such a fact is being concealed; (c) ignorance on the part of the one from whom such fact is concealed of the existence of the fact; (d) the intention that the concealment be acted upon; and (e) action on the concealment resulting in damages. *Teodonno v. Bachman*, 158 Colo. 1, 404 P.2d 284 (1965); *Ackmann v. Merchants Mortgage & Trust*, Colo.App., 619 P.2d 501 (1980) (*cert. granted*).

Whether Xerox had a duty to disclose its inability to provide 20-line capacity and reverse channel capability depends on the nature of the transaction and character of the information. *Ackmann v. Merchants Mortgage & Trust, supra.* Here the parties entered into a contract incorporating extensive, complex technical specifications covering a seemingly inexhaustive list of software and hardware requirements. Reverse channel capability was not even mentioned. Twenty-line capacity was referred to only with respect to expansion of the system which Xerox had not agreed to deliver. Consequently, we find no error in the trial court's determination that there was insufficient evidence to instruct the jury on fraudulent concealment.

### II. Release of Unknown Claims

The release of claims by ISC states on its face that it applies to both "known and unknown claims." The release provides that it is governed by California law and neither party has disputed the effect of this provision. Accordingly, the substantive analysis of the release is based on California law. On appeal ISC asserts that, under California law, the mere recital in the release that it applied to unknown claims was insufficient to keep the issue of intent to discharge a claim from the jury. We disagree.

Cal.Civ.Code § 1542 (West) states:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known to him must have materially affected his settlement with the debtor."

In *Casey v. Proctor*, 59 Cal.2d 97, 378 P.2d 579, 28 Cal.Rptr. 307 (1963), a personal injury case, the California Supreme Court interpreted § 1542, "to preclude the application of a release to unknown claims in the absence of a showing, apart from the words of the release of an intent to include such claims." It went on to state, as dicta, that "independently of § 1542" public policy compels this result in personal injury cases. Thus, § 1542, on its face and as interpreted, indicates that, under California law, ISC was entitled to present evidence of its intent not to release certain unknown claims.

However, in *Larsen v. Johannes*, 7 Cal.App.3d 491, 86 Cal.Rptr. 744 (1970), a case involving a commercial dispute between businesses, the California Court of Appeals held that a release which applied to "known and unknown" claims barred any claims unknown at the time of execution, specifically limiting the application of the rule in *Casey v. Proctor* to releases of claims relating to personal injuries. Relying on *Larsen v. Johannes* as the correct interpretation of California law, the trial court held that the release executed by ISC barred claims unknown at the time of the release.

When it did so, the trial court did not have before it the subsequently decided California case *Leaf v. City of San Mateo*, 104 Cal.App.3d 398, 163 Cal.Rptr. 711 (1980). In *Leaf v. City of San Mateo*, homeowners brought an action in inverse condemnation, continuing nuisance, and dangerous condition of public property, arising from damage to real property allegedly resulting from defective sewage and drainage systems of the defendant city. There the California Court of Appeals applied the rule of

*Casey v. Proctor* outside the context of a personal injury action without citing its earlier decision in *Larsen v. Johannes*. Citing *Leaf v. City of San Mateo*, ISC now asserts that the trial court erred in not permitting the jury to decide whether it intended to waive certain unknown claims when it executed the release.

The only way to reconcile the California cases is on their facts. And the facts here are substantially the same as those before the California Court of Appeals in *Larsen v. Johannes*. Because that case has not been overruled or reversed, we must assume it is controlling where, as here, the parties to the dispute have executed a release to certain contractual claims in a commercial setting. Consequently, we conclude that the release barred litigation of unknown claims.

III. *Affirmative Defenses to the Release*

ISC also contends that reversal is required because the trial court rejected its tendered instruction on the release which stated: "The release is invalid if you find that it was a result of fraud or duress as otherwise defined in these instructions." We disagree.

In determining whether the necessary law has been stated to the jury, all of the instructions must be considered as a whole. *Montgomery Ward & Co. v. Kerns*, 172 Colo. 59, 470 P.2d 34 (1970). Here, the jury was instructed that "ISC Corporation contends that the General Release . . . has no force or effect because it was induced by Xerox Corporation's fraud or by duress exerted against ISC Corporation." And the jury was instructed on the elements of fraud.

The trial court erred in rejecting the fraudulent inducement instruction on the basis of failure to show recision and tender by not taking into account Cal.Civ.Code § 1691 (West) which provides that filing of this proceeding was sufficient notice of recision and tender. However, because the jury was correctly instructed on the other elements of fraudulent inducement, this error was harmless. The jury's rejection of this defense necessarily was predicated on a

determination that another element had not been shown.

ISC's claim of duress arises from Xerox's cancellation of its lease with ED-CON. At Xerox's suggestion, ISC had contracted with EDCON, a third party, for the use of a computer which EDCON had leased from Xerox. When ISC and Xerox were in the process of negotiating the settlement agreement calling for the release, Xerox cancelled EDCON's lease, leaving ISC in a difficult position in that, without access to the computer, it could not service its customers. Although it is undisputed that EDCON had never paid rent on the leased equipment, ISC asserts that Xerox's cancellation of the lease was prompted by its desire to bring pressure to bear on ISC in order to force it to sign the settlement agreement and release absolving Xerox of liability in exchange for permitting ISC to use the computer.

ISC maintains Xerox's conduct constituted a bad faith breach of contract which, under California law, may constitute economic duress. *London Homes, Inc. v. Korn*, 234 Cal.App.2d 233, 44 Cal.Rptr. 262 (1965). But here, the record is devoid of evidence that Xerox breached its contract. Instead, it was EDCON's breach which gave rise to Xerox's legal right to cancel the lease, pursuant to its own terms. ISC cannot complain of duress simply because Xerox terminated a contract with a third party who failed to perform that contract.

IV. *The Promissory Notes—Judgment N.O.V.*

The trial court set aside a jury verdict and entered a judgment notwithstanding the verdict against Harold Tamblyn, finding that he was personally liable, as guarantor, for payment of certain promissory notes executed by ISC. Each of these notes was inscribed on its face over the signature of Harold Tamblyn as follows: "Payment of the above promissory note in accordance with these terms is hereby personally guaranteed." Moreover, Tamblyn raised no personal defense to his liability as guarantor. Thus, the evidence here was such that reasonable persons could not con-

clude that Tamblyn had not personally guaranteed the notes; hence, the trial court was correct in granting the judgment notwithstanding the verdict. *McGlasson v. Barger,* 163 Colo. 438, 431 P.2d 778 (1967); *Thorpe v. Durango School District No. 9–R,* 41 Colo.App. 473, 591 P.2d 1329 (1978), *aff'd,* Colo., 614 P.2d 880 (1980). The judgment against Tamblyn is affirmed.

We consider that Xerox has abandoned its cross-appeal because it was raised in neither the brief nor at oral argument.

Judgment affirmed.

COYTE and BERMAN, JJ., concur.