[No. A066477. First Dist., Div. Three. Oct. 3, 1995.]

RIVER BANK AMERICA, Plaintiff, Cross-defendant and Appellant, v. SANFORD N. DILLER et al., Defendants, Cross-complainants and Appellants;
HACIENDA GARDENS VENTURE, Cross-complainant and Appellant.

[No. A068152. First Dist., Div. Three. Oct. 3, 1995.]

RIVER BANK AMERICA, Plaintiff and Appellant, v.
HACIENDA GARDENS VENTURE et al., Defendants and Respondents.

## Counsel

Gibson, Dunn & Crutcher, Joel A. Feuer and Richard Pachter for Plaintiff, Cross-defendant and Appellant and for Plaintiff and Appellant.

Miller, Starr & Regalia, Edmund L. Regalia and Lewis J. Soffer for Defendants, Cross-complainants and Appellants, for Cross-complainant and Appellant, and for Defendants and Respondents.

## Opinion

**PARRILLI, J.**—We dispose of two related appeals in this opinion. In appeal No. A066477, River Bank America (River Bank) appeals from a summary judgment granted in favor of defendants Sanford N. Diller and Helen P. Diller (individually and as trustees of the DNS Trust) and Prometheus Development Company, Inc. (Prometheus Development). In the underlying action, River Bank sought to enforce guaranties the Dillers and Prometheus Development had executed. The guaranties secured a portion of River Bank's nonrecourse construction loans to Hacienda Gardens Venture, a limited partnership (Hacienda). River Bank made the loans—totaling $38 million—to finance the construction of a large apartment complex in Pleasanton, California. The trial court concluded the guaranties were unenforceable because they imposed upon the guarantors obligations "larger in amount

[or] in other respects more burdensome" than the nonrecourse obligations undertaken by the principal obligor (Hacienda). (Civ. Code, § 2809.)[1] In a cross-appeal, defendants[2] contend the trial court erred when it granted River Bank's motion for summary adjudication on defendants' claim of negligent misrepresentation against River Bank.

We reverse the summary judgment entered in favor of the guarantors, and affirm the summary adjudication of defendants' cross-claim for negligent misrepresentation. In addition, we affirm in part and reverse in part an order denying River Bank's motion for summary adjudication.

In appeal No. A068152, River Bank appeals from an order entered after judgment awarding defendants $241,874.22 in attorney fees and costs. Because we reverse the summary judgment, the award of attorney fees as prevailing party is also reversed.

## I. FACTS

Sanford Diller is a real estate developer based in Northern California. He and his wife Helen are the trustees of the DNS Trust, a revocable family trust, which owns all of the stock in Prometheus Development, the Dillers' principal development company. Sanford Diller is the principal officer of Prometheus Development.

In the spring of 1987 Prometheus Development had nearly completed the planning and approval process for a 456-unit apartment complex on property it owned in Pleasanton. To obtain capital for construction, Prometheus Development initially entered into negotiations with River Bank to form a joint venture to develop the property. However, those negotiations never resulted in a final joint venture agreement. Instead, River Bank ultimately agreed to make "participating construction loans"[3] to Prometheus Development.

In October 1987 River Bank made two construction loans to Hacienda, which is a limited partnership the Dillers formed for the specific purpose of

---

[1] Unless otherwise noted, subsequent statutory references are to the Civil Code.

[2] We refer to Hacienda, the Dillers, the DNS Trust, and Prometheus Development collectively as "defendants."

[3] Generally, a participating loan allows the lender to share in any profits from the leasing or sale of the real property during a specified period of time.

obtaining the construction loans.[4] The loans were for $36 million and $2 million, respectively, and were secured by first and second deeds of trust on the development property. A separate note evidenced each loan. Each note contained a "nonrecourse" clause that provided: "Notwithstanding anything to the contrary contained in this Note or any of the Security Documents, neither Maker [Hacienda], nor any partner in Maker, any legal representative, heir, estate, successor or assign of any such partner or any officer, director, shareholder or partner in any such partner, shall have personal liability for (i) the payment of any sum of money which is or may be payable hereunder or under any of the Security Documents, or (ii) the performance or discharge of any covenants or undertakings of Borrower hereunder or under any of the Security Documents; *provided, however, that the foregoing shall not limit the personal liability of any such entity or person in its capacity as a guarantor under any guaranty of the Note or of guaranty of completion of the construction.* The holder shall proceed solely against the premises and any other collateral given as security for the loan (including any guaranties), and it is expressly understood and agreed by and between Maker and the holder that no separate liability is assumed by, nor shall at any time be asserted or enforceable against Maker, under this Note or any other Security Document." (Italics added.) This nonrecourse clause was added to the notes at the insistence of Sanford Diller.

As further security for the construction loans, the Dillers and Prometheus Development (collectively the guarantors) executed four separate guaranty agreements. The Dillers executed two of the guaranty agreements on behalf of themselves and the DNS Trust. Each agreement guaranteed payment of 10 percent ($3.6 million and $200,000, respectively) of the two notes. Similarly, Sanford Diller executed two guaranty agreements on behalf of Prometheus Development. Again, each agreement guaranteed payment of 10 percent ($3.6 million and $200,000, respectively) of the two notes. The net effect of the guaranty agreements was that the Dillers personally guaranteed $3.8 million of the construction loans, and Prometheus Development separately and independently guaranteed an additional $3.8 million of the construction loans. Thus, between them, the Dillers and Prometheus Development guaranteed 20 percent ($7.6 million) of the aggregate construction loan.

River Bank funded the construction loans and Hacienda completed the apartment complex in late 1988. However, the rental income from the

---

[4]The Dillers have effective control over the entire partnership. Hacienda's general partner is a corporation, Prom XX, Inc. (Prom XX) which the Dillers own through their revocable trust. The DNS revocable trust and another limited partnership, the Prometheus/Hacienda Gardens partnership, were Hacienda's limited partners. Prometheus Development is the general partner of the Prometheus/Hacienda Gardens partnership, but owns only 1 percent of that partnership.

project was insufficient to pay all debt service on the property. Consequently, by October 10, 1991, Hacienda was delinquent in the amount of $830,445.

On October 15, 1991, River Bank commenced this action to foreclose on the property, to appoint a receiver, and to enforce the guaranty agreements. Defendants filed a cross-complaint alleging a cause of action for negligent misrepresentation against River Bank. The court appointed a receiver, and River Bank completed a nonjudicial foreclosure sale of the property on February 24, 1993. At the time of foreclosure, the outstanding debt was $42.9 million, but the property sold for only $30 million, leaving a $12.9 million deficiency. The receivership estate terminated on May 7, 1993.

After the foreclosure, River Bank proceeded against the guarantors to recoup a portion of the $12.9 million deficiency. In December 1993 River Bank filed a motion for summary adjudication on its cause of action to enforce the guaranty agreements against the Dillers and the DNS Trust (but did not file a similar motion as to Prometheus Development). In response, the Dillers and Prometheus Development filed their own motion for summary judgment as to the guaranty causes of action on the ground section 2809 provided a complete defense which the guarantors had not expressly or impliedly waived. While these motions were pending, River Bank also filed a motion for summary adjudication on the negligent misrepresentation causes of action in the cross-complaint. In addition, River Bank filed a motion to amend its complaint to add a cause of action to reform the guaranty agreements to reflect that the parties had intended that the guarantors would waive any defense based on section 2809.

On February 15, 1994, the trial court granted the Dillers' and Prometheus Development's motion for summary judgment on the causes of action to enforce the guaranties, and denied River Bank's motion for summary adjudication on those causes of action. On that same date, the trial court granted River Bank's motion for summary adjudication on defendants' crossclaim for negligent misrepresentation, and denied River Bank's motion for leave to file an amended complaint. On May 12, 1994, the trial court entered judgment disposing of the entire case. River Bank filed a timely notice of appeal from that judgment and Hacienda, the Dillers and Prometheus Development filed a cross-appeal from the portion of the judgment granting summary adjudication on their cause of action for negligent misrepresentation.

On August 26, 1994, the trial court granted defendants' motion for award of attorney fees and ordered River Bank to pay defendants $241,874 in

attorney fees and other costs. River Bank filed a separate notice of appeal from that postjudgment order (Code Civ. Proc., § 904.1, subd. (a)(2)).

## II. DISCUSSION

### A. *Section 2809*

The threshold issue in this case is whether section 2809 provides the Dillers and Prometheus Development with a complete defense to enforcement of their guaranties. Section 2809 states: "The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation." In granting summary judgment, the trial court relied on this section, and concluded that "the obligation purportedly assumed by [the guarantors] under their 'guaranties' was 'larger in amount [or] in other respects more burdensome than that of the principal,' in that under the terms of the loan documents, and particularly the 'nonrecourse' provisions thereof, the principal obligor, [Hacienda], had *from the inception* no exposure to personal liability." (Italics and second bracketed text in original.) The court also concluded that the Dillers and Prometheus Development had not waived their section 2809 defense.

In our view, it is a difficult question whether the guarantors' $7.6 million personal obligation is "more burdensome" than Hacienda's $38 million nonrecourse obligation. However, we need not decide that issue in this case. Instead, we conclude that, as a matter of law, the Dillers and Prometheus Development waived any defense based on section 2809. Consequently, we reverse the summary judgment on this issue.

### 1) *Standard of Review*

A moving party is entitled to summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) The law in effect in 1993 (when the summary judgment motion was filed) provided that "[a] defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2);

*Jambazian* v. *Borden* (1994) 25 Cal.App.4th 836, 843-844 [30 Cal.Rptr.2d 768].) ██ On appeal, we determine de novo whether there is a triable issue of material fact and whether the moving party is entitled to summary judgment as a matter of law. (*Jambazian* v. *Borden, supra,* at p. 844; *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719]; *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653]; *Fidelity Mortgage Trustee Service, Inc.* v. *Ridgegate East Homeowners Assn.* (1994) 27 Cal.App.4th 503, 508-509 [32 Cal.Rptr.2d 521].)

### 2) *Because the Guarantors Waived Their Section 2809 Defense, We Need Not Decide Whether the Guaranties Imposed Obligations on the Guarantors Which Were More Burdensome Than That of the Principal*

The first issue the parties ask us to address is whether section 2809 provides a defense to a guarantor who has personally guaranteed a contractual nonrecourse obligation. As indicated, we need not decide this issue because we conclude below that the guarantors waived any defense based on section 2809. Nevertheless, as background to the waiver issue, we briefly outline the arguments on both sides of this issue.

██ ██ As noted, section 2809 provides that "[t]he obligation of a surety must be neither larger in amount *nor in other respects more burdensome* than that of the principal"[5] and if it is, it will be reduced to match the principal's obligation. (Italics added.) ██ In determining whether the guarantor's obligation is larger in amount or "in other respects more burdensome," courts focus on the scope of the principal's liability at the time the guarantor executes his agreement. *Bloom* v. *Bender, supra,* 48 Cal.2d 793 (*Bloom*) makes this point clear. There, the California Supreme Court explained that section 2809 has its roots in the Napoleonic Code. In particular, section 2013 of the Napoleonic Code provided that " 'The security must not exceed what is due from the debtor, nor be contracted under conditions more burthensome.' " (*Bloom, supra,* at p. 802.) The Supreme Court stated: "This rule of the civil law appears to relate to conditions *at the time of the execution of a guarantee agreement,* and to provide that at the time of the contracting of the surety's obligations he cannot agree to perform higher and greater obligations than those *then* imposed on the principal debtor." (*Ibid.,* italics added.)

---

[5]Although section 2809 speaks in terms of "sureties," and the Dillers and Prometheus Development are described as "guarantors," these labels are synonymous under current California law. In 1939, the Legislature amended section 2787 to eliminate any distinction between "sureties" and "guarantors." (*Bloom* v. *Bender* (1957) 48 Cal.2d 793, 795, fn. 1, 797 [313 P.2d 568]; Rintala, *California's Anti-Deficiency Legislation and Suretyship Law: The Transversion of Protective Statutory Schemes* (1969) 17 UCLA L.Rev. 245, fn. 1, 263-264 (Rintala).)

Here, at the time they signed the guaranties, it is unclear whether the Dillers and Prometheus Development "agree[d] to perform higher and greater obligations than those *then* imposed on the principal debtor [Hacienda]." (*Bloom, supra,* 48 Cal.2d at p. 802, italics added.) Hacienda signed notes stating that it and its partners would have no "personal liability" under the notes, and that River Bank would "proceed solely against the premises and any other collateral given as security for the loan (including any guaranties), and it is expressly understood and agreed by and between Maker and the holder that no separate liability is assumed by, nor shall at any time be asserted or enforceable against Maker, under this Note or any other Security Document."

Thus, from the time Hacienda signed the notes, it and its partners had absolutely no personal liability for the $38 million loan. From the outset, the lender could only proceed against "the premises." If the proceeds from sale of "the premises" were insufficient to satisfy the outstanding debt (as turned out to be the case), River Bank had no recourse against other assets not connected to the apartment complex.[6]

By contrast, under the terms of the guaranties, the Dillers and Prometheus Development "absolutely and unconditionally jointly and severally guarantee[d]," and "independently assume[d] liability" for a portion (20 percent) of the notes. Thus, although the guarantors assumed personal liability and thus subjected all of their assets to risk, they limited their exposure to an aggregate 20 percent of the face amount of the notes.

Clearly, the guarantors' obligations in this case were not "larger in amount" than that of the principal. However, in our view, it is difficult—if not impossible—to say which of these obligations is "more burdensome."[7] From a developer's perspective, a loan that subjects his or her entire net worth to risk may be viewed as "more burdensome" than a loan that puts only the assets of a specific project at risk. Here, however, the developers personally guaranteed only a small portion (20 percent) of the amount borrowed, and were thus able to limit exposure of their personal assets. By

---

[6]Under a separate security agreement, River Bank also had a security interest in Hacienda's personal property "used on or in connection with the Property . . . ." In addition, Hacienda executed an assignment of leases and rents in connection with the property.

[7]River Bank devotes a substantial portion of its opening brief to a nonissue; namely, whether the promissory notes Hacienda signed created an "obligation" for purposes of section 2809. Defendants have never argued that Hacienda had no "obligation" to River Bank under the promissory notes and security agreements. Instead, they argue that Hacienda's nonrecourse "obligation" is less burdensome than the guarantors' personal obligation. We agree with defendants that this entire line of argument is "an irrelevant attack upon a strawman," and therefore do not respond to the arguments in detail.

contrast, although Hacienda and its partners had no personal liability for the $38 million loan, they did risk everything they put into the project, including the land. We are hard pressed to say which of these obligations is "more burdensome": a personal obligation which is limited to $3.6 million, or a "nonrecourse" $38 million construction loan which puts at risk everything the borrower sinks into the project. Fortunately, in this case we need not answer this question.[8]

### 3) *The Guarantors Waived Their Section 2809 Defense*

 ██ ██ Assuming, for the purpose of argument, that section 2809 could provide the guarantors with a defense in this case, we nevertheless conclude that, as a matter of law, the guarantors waived any defense based on section 2809 when they signed the guaranty agreements.[9]

 In *Bloom, supra,* the Supreme Court concluded section 2809 is not only waivable, but that it could be waived on the basis of a very vague clause in the guaranty agreement. (48 Cal.2d. at p. 804; Rintala, *supra,* 17 UCLA L.Rev. at pp. 328-329; see also Comment, *Issues in the Enforcement of Carry Guarantees and Completion Guarantees: Anti-Deficiency Rules, Suretyship Statutes, and Common Law* (1989) 37 UCLA L.Rev. 225, 254-255 (Comment).) No subsequent case has overruled or even criticized *Bloom* on this point. In *Bloom,* the defendant argued that "a surety contract wherein the surety agrees to remain liable even though the principal is released [by his creditors] is a contract which imposes greater obligations on the surety than on the principal" and thus comes within the ambit of section 2809. (48 Cal.2d at pp. 801-802.) The Supreme Court noted that such a construction of section 2809 would be "inharmonious" with section 2819, which contemplates continuing liability of the surety when he consents to the principal's

---

[8]River Bank cites a trio of cases in which River Bank claims the courts have refused to apply the section 2809 defense in circumstances analogous to this case. (See *Loeb* v. *Christie* (1936) 6 Cal.2d 416 [57 P.2d 1303]; *Katz* v. *Haskell* (1961) 196 Cal.App.2d 144 [16 Cal.Rptr. 453]; *Heckes* v. *Sapp* (1964) 229 Cal.App.2d 549 [40 Cal.Rptr. 485].) In particular, River Bank claims those cases stand for the broad proposition that section 2809 does not apply to guaranty agreements for loans secured by real property. However, those cases do not support such a broad proposition, and we do not find them persuasive on the issue before us. None of the cases compel a conclusion that a personal guaranty is not "more burdensome" than a contractual nonrecourse obligation. Indeed, *Loeb* v. *Christie, supra,* suggests that the absence of personal liability is an important factor in determining whether an obligation is more burdensome.

[9]"[I]t is 'solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.'" (*U.S. Leasing Corp.* v. *DuPont* (1968) 69 Cal.2d 275, 284 [70 Cal.Rptr. 393, 444 P.2d 65], quoting *Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) Here, defendants have not offered any extrinsic evidence to aid in interpreting the waiver provisions in the guaranty agreements. Consequently, we may resolve this issue as a question of law.

discharge. Moreover, the court noted that section 2809 applies to "conditions at the time of the execution of a guarantee agreement," and that nothing in the rule prevents the surety from agreeing that his liability will remain even though some future event eliminates the principal's obligation. (48 Cal.2d at pp. 802-803.)

The *Bloom* court then turned to the issue of waiver. The court first noted that we must construe surety contracts using the same rules that apply to the interpretation of other contracts. (48 Cal.2d at p. 803; §§ 2837, 3268.) In particular, the *Bloom* court relied on section 3268, which provides that the statutory rules regarding contracts, *including* those which apply specifically to surety contracts, " 'are subordinate *to the intention of the parties*, when ascertained in the manner prescribed [for] the interpretation of contracts; *and the benefit thereof may be waived by any party entitled thereto*, unless such waiver would be against public policy.' " (*Bloom, supra*, at p. 803, italics added.) In concluding that the *Bloom* defendant had waived the benefit of section 2809, the Supreme Court stated: "The parties by their contract specifically agreed that the liability of the surety was not to be terminated by the discharge of the debtor through a composition of creditors. This expressed intention alone might well be controlling under the provisions of sections 3268 and 2837, *but even if a waiver of the limitation of section 2809 is necessary, the language of the contract adequately expresses such a waiver*." (48 Cal.2d at p. 804, italics added.)

In *Bloom,* the court relied on the following clause in the guaranty agreement to find that the guarantor had waived section 2809: " 'The liability hereby assumed shall not be affected by any forbearance by you, or by the giving of any extension of time or by any other modification of any sale, contract, account or obligation or instrument in connection therewith, or by the acceptance of any settlement or composition offered by . . . [the debtor] either in liquidation, readjustment, receivership, bankruptcy or otherwise.' " (48 Cal.2d at p. 796.) As one commentator has noted, the Supreme Court found waiver despite the absence of any reference in the agreement to section 2809 or any other suretyship provision, and the lack of any language indicating an intent to "waive" the statutory rights accorded a guarantor. (Rintala, *supra*, 17 UCLA L.Rev. at p. 329, fn. 304.)

It is against this backdrop that we must measure the "waiver" provisions of the present guaranty agreements. ▮▮▮ We conclude that, pursuant to the standard established by the Supreme Court in *Bloom*, the

language in the present guaranty agreements is sufficient to constitute a waiver of a defense based on section 2809.[10]

■ Again, guaranty contracts are construed according to the same rules as those used for other contracts, with a view to ascertaining the intent of the parties. (*Bloom*, *supra*, 48 Cal.2d at p. 803; *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1461 [37 Cal.Rptr.2d 563].) Guaranty contracts "may be explained by reference to the circumstances under which they were made and the matter to which they relate, the main object being to ascertain and effectuate the intention of the parties." (*Bank of America* v. *Waters* (1962) 209 Cal.App.2d 635, 638 [26 Cal.Rptr. 9].)

■ Here, the guaranty agreements contain several provisions which, taken together, indicate the guarantors waived any defense based on section 2809. First, the guaranty agreements provide that "Guarantors hereby absolutely and unconditionally . . . guarantee to Lender, and independently assume liability to Lender, without any requirement whatsoever of resort by Lender to any other party . . . . The joint and several obligations of Guarantors shall be limited to [either $3.6 million or $200,000, depending on

---

[10]In a supplemental brief, defendants suggest they are protected by section 2810 as well as by section 2809 and that the guarantors had to waive the protections of both sections. We need not separately consider whether the guarantors waived the protection of section 2810 as that section is not applicable in this case. As is pertinent here, section 2810 provides that a guarantor is "not liable if for any [reason other than the personal disability of the principal] there is no liability upon the part of the principal at the time of the execution of the contract, or the liability of the principal thereafter ceases, unless the surety has assumed liability with knowledge of the existence of the defense." Here, however, the nonrecourse provision in the notes did not relieve the principal of all "liability" within the meaning of section 2810. Rather, the nonrecourse provision merely deprived River Bank of a remedy to enforce that liability. Although the nonrecourse provision precluded the principal's "personal" liability, it did not absolve it of all liability. The nonrecourse provision specifically provided that the "holder shall proceed solely against the premises and any other collateral given as security for the loan . . . and it is expressly understood and agreed by and between Maker and the holder that no separate liability is assumed by, nor shall at any time be asserted as enforceable against Maker . . . ." Thus, the notes contemplated that, although Hacienda was "liable" to the extent permitted under the notes, Hacienda did not assume any separate "personal" liability. This is not equivalent to finding that Hacienda had no liability for the notes. The court in *Gottschalk* v. *Draper Companies* (1972) 23 Cal.App.3d 828 [100 Cal.Rptr. 434] reached a similar conclusion. There the court concluded that Code of Civil Procedure section 580b (prohibiting deficiency judgments in certain purchase money transactions) did not provide the guarantors with a defense under section 2810. The court stated: "[The principal debtor] has remained liable after the foreclosure sale and section 580b has barred only respondents' *remedy* against it, [consequently,] appellant cannot avail themselves of a defense based upon Civil Code section 2810, which requires the nonexistence or cessation of the principal's *liability* to make the surety also exempt." (23 Cal.App.3d. at p. 831, italics in original.) Consequently, section 2810 does not provide the guarantors with a defense in this case.

which note is being guaranteed]; *provided that no amounts shall be credited against the foregoing limitation by reason of . . . (v) the application of any foreclosure proceeds."* (Italics added.) In other words, the guarantors understood that their obligation would not be terminated (or even reduced) by River Bank's receipt of foreclosure proceeds from the secured property.

Second, the guaranty agreements provide: "The guaranty by Guarantors provided for in this Agreement *is an absolute and unconditional joint and several guaranty of payment and performance*; and is not a guaranty of collection. The liability of Guarantors hereunder *is independent of the aforesaid obligations* to pay which are hereby guaranteed . . . and of the liabilities of any other guarantors of the Obligations." (Italics added.)

Third, the guaranty agreements provide: "Lender may bring and prosecute a separate action against Guarantors, or any of them, to enforce their liabilities hereunder, whether or not any action is brought against Borrower or any other person and whether or not Borrower or any other person is joined in any such action or actions. *Nothing shall prohibit Lender from exercising its rights against Guarantors, Borrower, the security . . . for the Obligations, and any other person simultaneously, jointly and/or severally."* (Italics added.)

Finally, the agreements provide that "Guarantors shall not be discharged, released or exonerated, in any way, from their absolute, unconditional and independent joint and several liabilities hereunder, even though any rights or defenses which Guarantors may have against . . . *Lender* or others may be destroyed, diminished *or otherwise affected*, by . . . (d) The sale or enforcement of, or realization upon . . . any security for any of the Obligations, even though (i) recourse may not thereafter be had against Borrower for any deficiency . . . ." (Italics added.)

Taken together, these provisions indicate the following: (1) the guarantors knew their guaranties were separate and independent from Hacienda's obligation; (2) the guarantors agreed River Bank could proceed directly against the guarantors without first proceeding against the security; (3) even if River Bank did first proceed against the security, the guarantors understood that the receipt of foreclosure proceeds would not terminate or reduce their obligations under the guaranties. In short, the guarantors understood that their personal obligations on the guaranties were completely separate from, and not affected by, the security provisions in the notes. To paraphrase *Bloom*: The parties by their contract specifically agreed that the liability of the surety was not to be affected by the security provisions in the notes. This expressed intention alone might well be controlling under the provisions of sections 3268 and 2837, *but even if a waiver of the limitation of section*

*2809 is necessary, the language of the contract adequately expresses such a waiver.*

The undisputed facts concerning the circumstances under which the parties made the guaranties support our finding of waiver. (*Bank of America* v. *Waters, supra,* 209 Cal.App.2d at p. 638.) First, all parties to this transaction—including the guarantors—were sophisticated business persons with special expertise in real estate development.[11] Moreover, all parties—including the guarantors—were represented by counsel in negotiations. Finally, and perhaps most important, Sanford Diller signed both the guaranties and the notes obligating Hacienda on its principal obligation. Thus, although he was acting in different capacities when he signed the notes and guaranties, he was nevertheless personally aware of the terms of the notes. As indicated above, one of the terms of the notes was that the nonrecourse provision "shall not limit the personal liability of any . . . entity or person in its capacity as a guarantor under any guaranty of the Note or of guaranty of completion of the construction . . . ." Thus, if guaranty contracts "may be explained by reference to the circumstances under which they were made and the matter to which they relate" (*Id.* at p. 638) and our primary purpose is to ascertain the intent of the parties (*Bloom, supra,* 48 Cal.2d at p. 803; §§ 2837, 3268), it seems clear the parties intended that the guarantors would remain personally liable on the guaranties despite the nonrecourse provision in the notes.

We do not find defendants' cases on waiver persuasive. Defendants contend that, to be effective, a written waiver of section 2809 must state the precise nature of the guarantor's defense and the fact that it is being waived. They further contend that, under this standard, the present guaranty agreements are insufficient to constitute a waiver of their rights under section 2809. Defendants' primary authority for this position is *Cathay Bank* v. *Lee* (1993) 14 Cal.App.4th 1533 [18 Cal.Rptr.2d 420]. In *Cathay Bank,* the court had to determine whether the defendant had waived the judicially created "*Gradsky* defense" when he executed a guaranty on a bank loan. The *Gradsky* defense is based on *Union Bank* v. *Gradsky* (1968) 265 Cal.App.2d 40 [71 Cal.Rptr. 64]. *Gradsky* held that a lender is estopped from recovering a deficiency judgment against a guarantor when the lender elects to proceed against the security by nonjudicial foreclosure, because this election cuts off the guarantor's subrogation rights against the debtor. Thus, even though the pertinent antideficiency statute (Code Civ. Proc., § 580d) does not directly protect guarantors, as a practical matter the "*Gradsky* defense" prevents the

---

[11]It is unclear how much expertise Helen Diller has as a real estate developer. She is an officer in Prom XX, but it is unclear whether she takes an active role in her husband's business. In any event, we assume that Sanford Diller, who clearly has such expertise, was primarily responsible for negotiating the guaranties on behalf of the Dillers.

lender from obtaining a deficiency judgment against the guarantor unless the lender elects the more cumbersome remedy of judicial foreclosure. (*Cathay Bank, supra*, at p. 1535.)

In deciding that the language in the guaranty agreement before it did not constitute an adequate waiver of the *Gradsky* defense, the *Cathay Bank* court surveyed the cases that had addressed this precise issue; i.e., cases that considered whether contractual language was sufficient to waive the *Gradsky* defense. (*Cathay Bank* v. *Lee, supra*, 14 Cal.App.4th at p. 1537.) The *Cathay Bank* court did not look to other cases—such as *Bloom, supra*, 48 Cal.2d 793—which considered the waiver of other statutory surety defenses. *Cathay Bank* concluded that, in order to waive the *Gradsky* defense, the waiver must explain that (1) the guarantor has a defense to a deficiency judgment based on the destruction of its subrogation rights through nonjudicial foreclosure; and (2) the guarantor is waiving that specific defense. (14 Cal.App.4th at pp. 1538-1539.)

In apparent response to *Cathay Bank*'s strict holding, the Legislature enacted section 2856, effective January 1, 1995. That section provides in pertinent part: "(a) Any guarantor, including a guarantor of an obligation secured by real property or any interest therein, may waive the guarantor's rights of subrogation and reimbursement and any other rights and defenses available to the guarantor by reason of Sections 2787 to 2855, inclusive, including, without limitation, (1) any defenses the guarantor may have to the guaranty obligation by reason of an election of remedies by the creditor . . . . [¶] (b) *Any language that expressly sets forth a waiver of suretyship rights or defenses described in subdivision (a) . . . shall be effective* whether or not it contains references to statutory provisions or judicial decisions."[12] (Italics added.) In addition, the statute which enacted these provisions states

---

[12]Section 2856 provides in full: "(a) Any guarantor, including a guarantor of an obligation secured by real property or any interest therein, may waive the guarantor's rights of subrogation and reimbursement and any other rights and defenses available to the guarantor by reason of Sections 2787 to 2855, inclusive, including, without limitation, (1) any defenses the guarantor may have to the guaranty obligation by reason of an election of remedies by the creditor and (2) any rights or defenses the guarantor may have by reason of protection afforded to the principal with respect to the obligation so guaranteed pursuant to the antideficiency or other laws of this state limiting or discharging the principal's indebtedness, including, without limitation, Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure. [¶] (b) Any language that expressly sets forth a waiver of suretyship rights or defenses described in subdivision (a), or any of them, shall be effective whether or not it contains references to statutory provisions or judicial decisions. The following language shall be an effective waiver of the guarantor's defense to a recovery by the creditor by reason of the creditor's election of remedies: [¶] Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the guarantor's rights of subrogation and reimbursement against the principal by the operation of

that the new provisions do "not represent a change in, but are merely declarative of, existing law." (Stats. 1994, ch. 1204, § 2.)

We decline to apply *Cathay Bank*'s strict waiver requirements in this case. First, *Cathay Bank* did not purport to set out a wavier standard applicable to all surety defenses. To the contrary, *Cathay Bank* focused on the narrow issue of whether there was a sufficient waiver of the *Gradsky* defense. Other courts have found waiver of other suretyship rights and defenses on the basis of language which would not meet *Cathay Bank*'s strict knowledge and waiver requirements. (See *Bloom, supra,* 48 Cal.2d at p. 804 [§ 2809]; *American Security Bank* v. *Clarno* (1984) 151 Cal.App.3d 874, 882 [199 Cal.Rptr. 127] [§ 2819]; *Union Bank* v. *Ross* (1976) 54 Cal.App.3d 290, 294 [126 Cal.Rptr. 646] [§§ 2819, 2845].) Second, unlike *Bloom, Cathay Bank* did not address the precise issue which concerns us in this case: namely, the waiver of a defense based on section 2809. Third, although it purports to be "declarative of existing law" it is clear the Legislature enacted section 2856 to ameliorate the strict rule laid down in *Cathay Bank*. Thus, under section 2856, subdivision (b), a guarantor may waive a surety defense using "[a]ny language that expressly sets forth a waiver . . . ."

In sum, we choose to follow *Bloom, supra,* on the waiver issue. *Bloom* is a Supreme Court case that directly addresses the precise issue we are considering here. We do not believe *Cathay Bank* is controlling, as it does not address the precise issue before us, and has arguably been eroded by the recently enacted legislation. We therefore conclude that, as a matter of law, the guarantors waived any defense based on section 2809.

## B. *River Bank's Motion for Summary Adjudication*

River Bank contends that if section 2809 does not provide a defense in this case, we must reverse the trial court's order denying River Bank's motion for summary adjudication of its cause of action to enforce the guaranties against Sanford Diller, Helen Diller and the DNS Trust (collectively the Dillers).[13] Defendants counter that, even if the Dillers did waive their rights under section 2809, summary adjudication in favor of River

Section 580d of the Code of Civil Procedure or otherwise. [¶] (c) Subdivision (b) shall not apply to a guaranty of a loan to an individual primarily for personal, family, or household purposes, secured by a deed of trust or mortgage on a dwelling for not more than four families when the dwelling is occupied, entirely or in part, by the borrower."

[13]We note that River Bank moved for summary adjudication only on the third cause of action, which alleged a breach of guaranty as to the Dillers only. River Bank did not move for summary adjudication on its cause of action to enforce the guaranties against Prometheus Development. Consequently, River Bank does not raise this issue on appeal as to Prometheus Development.

Bank would be improper because triable issues of material fact exist regarding the Dillers' "sham guaranty" and "estoppel" defenses.

### 1) *The Sham Guaranty Defense*

 In addition to arguing below that their guaranties were unenforceable under section 2809, the Dillers also argued that their guaranties were unenforceable "sham guaranties" because River Bank actually looked to the guarantors as the primary obligors, and structured the loan to avoid the protections of the antideficiency legislation. (See *Valinda Builders, Inc.* v. *Bissner* (1964) 230 Cal.App.2d 106 [40 Cal.Rptr. 735].) Section 2787 provides that "[a] surety or guarantor is one who promises to answer for the debt . . . *of another* . . . ." (Italics added.) "That the names 'on the dotted line' are different on the promissory note and trust deed, on the one hand, and on the guarantee agreement, on the other hand, is not enough to qualify under section 2787, since 'the supposed guarantors against whom suit has been brought [could be] nothing more than principal obligors under another name.'" (Comment, *supra*, 37 UCLA L.Rev. at p. 231, quoting *Union Bank* v. *Dorn* (1967) 254 Cal.App.2d 157, 159 [61 Cal.Rptr. 893], bracketed text in original.) Importantly, if the guarantor is actually the principal obligor, he is entitled to the unwaivable protection of the antideficiency statutes, including Code of Civil Procedure section 580d, which prohibits a deficiency judgment after nonjudicial foreclosure of real property under a power of sale (as occurred here). (*Union Bank* v. *Dorn*, *supra*, at pp. 158-159; *Valinda Builders, Inc.* v. *Bissner*, *supra*, at p. 112.)

 In denying River Bank's motion for summary adjudication, the trial court specifically found there were triable issues of material fact regarding the Dillers' "sham guaranty" defense.[14] We agree with this finding, and therefore refuse to reverse the trial court's order on this point.

Because River Bank was the moving party in this instance, we must view the evidence on this issue in the light most favorable to the Dillers to determine if there is a triable issue of fact. Viewed in that light, the record shows the following pertinent facts: As originally contemplated, Sanford

---

[14]In particular, the trial court found that "the facts are in dispute as to whether (1) the entire transaction appears to have been structured to avoid the antideficiency preclusion of Code of Civil Procedure section 580d, (2) the lender intended from the outset to look to the real property security for collection of the debt, released the purported 'principal obligor' from any personal liability by virtue of the nonrecourse provisions of the loan instruments, and intended to look to the purported 'guarantors' exclusively for collection of any deficiency after foreclosure, and (3) the general partner of the purported 'principal obligor' was an undercapitalized corporation, entirely owned by defendants, whose financial wherewithal plaintiff never investigated."

Diller intended to acquire and develop the Hacienda Gardens Apartments using a limited partnership (Prometheus Hacienda Gardens) under which Prometheus Development was the general partner and Prom XX, as the nominee for the DNS Trust, was the original limited partner. Prom XX is a closely held California corporation, wholly owed by the DNS Trust. Diller is its president and only director. According to Sanford Diller, "[e]ver since its inception, PROM XX, Inc. has been used as a 'shell' or 'shelf' corporation, and essentially served the role of a 'place marker' in the initial structuring of real estate development operations."[15] Prom XX has never had substantial capital or assets.

After it acquired the rights to the Hacienda Gardens property, Prometheus Development entered into negotiations with River Bank to form a joint venture to develop the property. Sanford Diller believes that by June 1987 those negotiations resulted in a final, enforceable joint venture agreement, in which Prometheus Development would be the general partner and River Bank a limited partner. However, in late July 1987 River Bank informed Prometheus Development that it had decided unilaterally to change the entire structure of the proposed agreement. Instead of the joint venture agreement originally contemplated, River Bank restructured the deal to its present form as a participating loan with accompanying guarantees. According to Diller, he and his wife executed the documents memorializing the loan and guarantees "[u]nder economic duress."

Importantly, according to Sanford Diller: "During the course of drafting this final set of documentation, counsel for RIVER BANK insisted that in order to render 'enforceable' the 'guaranty' being given by PROMETHEUS, a new 'borrower' should be brought into existence. That is, instead of creating a general partnership consisting of PROMETHEUS and RIVER BANK, as the parties had originally agreed to do, or even lending money to a 'borrower' entity of which PROMETHEUS was the general partner, RIVER BANK now

---

[15]In explaining the meaning of a "place marker," Sanford Diller explained: ". . . PROMETHEUS would acquire the rights to certain real property, with the intent to obtain equity financing through a private limited partnership offering or syndication, and then to acquire and develop the property with both that equity financing and acquisition and development loans secured by the real property. A limited partnership would then be structured, often bearing a name including the word 'Prometheus' together with the property's name, and having as its initial limited partner PROM XX.

"In every instance of which I am aware, once a private offering or syndication was accomplished, and equity investments were obtained from various investors who became the limited partners of the partnership formed to [develop a particular parcel of land], PROM XX was removed as the initial limited partner, and had no further role in the acquisition or development of the real property. PROM XX has never maintained substantial capital or assets of its own. PROM XX never made any substantial investment of funds in any of these limited partnership structures."

required that the 'borrower' be a limited partnership, of which the general partner was an entity other than PROMETHEUS. Faced with that requirement, PROMETHEUS suggested that PROM XX be inserted as such new general partner. So far as [Sanford Diller knew] RIVER BANK never inquired about the financial standing of PROM XX during the loan application process, or even up to the closing of the 'loan,' . . . Rather, RIVER BANK relied upon the extensive financial statements which it required to be provided reflecting the financial strength of PROMETHEUS, the DNS TRUST, HELEN DILLER and [SANFORD DILLER], since it was these persons (nominally the 'guarantors') [to] which RIVER BANK at all times actually looked as the 'borrowers.' "

Ultimately, River Bank made the loans to this newly formed partnership, which we have called "Hacienda" throughout this opinion. The Dillers have effective ownership and control of the entire Hacienda partnership. As indicated, Hacienda's general partner is Prom XX, which the Dillers own through their revocable trust.

Had the Dillers themselves been the general partners of Hacienda, and had they attempted to guarantee Hacienda's debt, there is no question such guaranty would have been a sham. In those circumstance, the Dillers would have been treated as primary obligors and would be entitled to the unwaivable protection of Code of Civil Procedure section 580d, which prohibits a deficiency judgment after nonjudicial foreclosure under a power of sale. (*Union Bank* v. *Dorn*, *supra*, 254 Cal.App.2d at pp. 158-159 [guarantors who were general partners of primary obligor are "principal obligors . . . entitled to the full protection of Code of Civil Procedure, section 580d . . . ."]; *Riddle* v. *Lushing* (1962) 203 Cal.App.2d 831 [21 Cal.Rptr. 902]; *Valinda Builders, Inc.* v. *Bissner*, *supra*, 230 Cal.App.2d at p. 112 [waiver of Code of Civil Procedure section 580d invalid as against public policy].) However, that is not our case. Instead, the general partner of the primary obligor (Hacienda) is a corporation (Prom XX) which the Dillers fully own and control. Nevertheless, we believe that, for the purpose of summary adjudication, this is a distinction without a difference.

 It is a factual question whether a person is a true guarantor or a principal obligor in guarantor's guise. (*Younker* v. *Reseda Manor* (1967) 255 Cal.App.2d 431, 438 [63 Cal.Rptr. 197].) In this regard, the court in *Torrey Pines Bank* v. *Hoffman* (1991) 231 Cal.App.3d 308, 320 [282 Cal.Rptr. 354], stated: "The correct inquiry set out by the authority is whether the purported debtor is anything other than an *instrumentality* used by the individuals who guaranteed the debtor's obligation, and whether such instrumentality actually removed the individuals from their status and obligations as debtors. (*Valinda*, *supra*, at p. 110.) Put another way, are the supposed guarantors

nothing more than the principal obligors under another name? (*Dorn, supra,* at p. 159.) ██ As stated in *Union Bank* v. *Brummell* [(1969)] 269 Cal.App.2d 836, 838 [75 Cal.Rptr. 234], *the legislative purpose of the antideficiency law may not be subverted by attempting to separate the primary obligor's interests by making a related entity the debtor while relegating the true principal obligors to the position of guarantor*s. [Citation and fn. omitted.][16] [¶ ██ To determine whether the [purported guarantors] as individuals were primary obligors . . . such that their guaranties must be considered ineffective, we apply the approach of *Commonwealth Mortgage Assurance Co.* v. *Superior Court* [(1989)] 211 Cal.App.3d 508, 515 [259 Cal.Rptr. 425], *and look to the purpose and effect of the agreements to determine whether they are attempts to recover deficiencies in violation of section 580d.*" (Italics added.)

██ In our view, the Dillers have raised a triable issue of fact whether, by structuring the loan transaction as it did, River Bank subverted the purpose of the antideficiency laws "by making a related entity the debtor while relegating the principal obligors to the position of guarantors." According to Sanford Diller's declaration, River Bank never inquired about the financial standing of Prom XX, Hacienda's nominal general partner. Instead, River Bank relied upon extensive financial statements reflecting the financial strength of the guarantors: Prometheus Development, the DNS Trust, Helen Diller and Sanford Diller, since it was these persons to which River Bank at all times actually looked to as the "borrowers."

Moreover, there is evidence that the "purpose and effect" of the agreements were to recover deficiencies in violation of Code of Civil Procedure section 580d. Indeed, according to Sanford Diller, this is the reason River Bank insisted that Prometheus Development be removed as general partner, and another entity, Prom XX, be inserted, even though it was a mere "shell" corporation. As the trial court put it, there is a triable issue of fact whether the entire transaction was structured to avoid the antideficiency preclusion of Code of Civil Procedure section 580d.

Nor is it conclusive, as River Bank contends, that the general partner in this case was a long-standing corporation that adhered to all formalities. Even where a corporation is the nominal primary obligor, and the debt is

---

[16]Those purposes are: " '(1) to prevent a multiplicity of actions, (2) to prevent an overvaluation of the security, (3) to prevent the aggravation of an economic recession which would result if creditors lost their property and were also burdened with personal liability, and (4) to prevent the creditor from making an unreasonably low bid at the foreclosure sale, acquir[ing] the asset below its value, and also recover[ing] a personal judgment against the debtor.' [Citations.]" (*Torrey Pines Bank* v. *Hoffman, supra,* 231 Cal.App.3d 308, 318.)

guaranteed by its officers and shareholders, the guarantors may nevertheless be considered the primary obligors. This is true even though the corporation's debt does not directly obligate the shareholders and officers. (*Valinda Builders, Inc.* v. *Bissner, supra,* 230 Cal.App.2d at pp. 107-108, 111; *Union Bank* v. *Brummell* (1969) 269 Cal.App.2d 836, 837-838 [75 Cal.Rptr. 234].) *Union Bank* v. *Brummell, supra,* involves facts similar to those alleged in this case. There, individual investors originally intended to purchase the property in their own names. The bank advised or required them instead to have a corporation take title, and required two corporate officers to execute personal guaranties. This structure was allegedly for the purpose of avoiding the effect of the antideficiency legislation. As in the present case, the corporation which took title was in existence at the time of execution of the note and deed of trust, and was not formed for the purpose of taking title. Nevertheless, the court concluded the arrangement violated the purpose of the antideficiency legislation, and that such purpose "may not be subverted by use of a corporation with the true principal obligor relegated to the position of guarantor." (269 Cal.App.2d at p. 838.)

In sum, we conclude that the Dillers have raised a triable issue of fact concerning their "sham guaranty" defense.

2) *Estoppel Defense*

In addition to finding there were triable issues of fact concerning the "sham guaranty" defense, the trial court also found that there were triable issues of fact concerning the Dillers' estoppel defense. We disagree with this conclusion, and reverse the order denying summary adjudication of the estoppel defense to the extent it is based on economic duress. However, we do not intend to preclude defendants from raising an estoppel defense based on other factual theories.

The Dillers contend River Bank was estopped to enforce the guaranties because River Bank initially agreed to a joint venture, but then changed the structure of the transaction at the last moment to a loan and guaranties. According to Sanford Diller, after he reached a tentative joint venture agreement with River Bank (a point which River Bank disputes), Prometheus Development began development of the property and incurred expenses and other obligations. After this time, River Bank "unilaterally" changed the structure of the deal to loans and guaranties. Because of the difficulty in finding alternative financing, defendants executed the loans and guaranties "[under] economic duress." Even if these facts are true, they do not establish a defense based on economic duress.

This case is controlled by *London Homes, Inc.* v. *Korn* (1965) 234 Cal.App.2d 233 [44 Cal.Rptr. 262]. There, the court held there was no "duress" or "business compulsion" as a matter of law, where a plaintiff voluntarily agreed to pay more for land than it had originally agreed. At the time the sellers demanded more money per acre than had originally been agreed in the deposit receipt, the buyer/plaintiff could have brought suit against them for damages, but for what seemed good business reasons, elected not to do so. Instead, the buyer/plaintiff paid the higher price, even though it was not required to do so. "It is not duress . . . to take a different view of contract rights, even though mistaken, from that of the other contracting party, and it is not duress to refuse, in good faith, to proceed with a contract, even though such refusal might later be found to be wrong. [¶] . . . 'A mere threat to withhold a legal right for the enforcement of which a person has an adequate [legal] remedy is not duress.'" (*Id.* at p. 240.)

This case falls squarely within the holding of *Korn*. Consequently, there was no "economic duress" upon which an estoppel can be based. If defendants believed they had in fact reached a "joint venture" agreement with River Bank, they could have immediately sued to enforce that agreement once River Bank reneged. As it was, after considering other alternatives, including finding other financial partners, defendants made a business decision to accept the loan and guaranty agreement. In a single paragraph, defendants make a half-hearted attempt to distinguish *Korn* on the ground that, in that case, the theory of "economic duress" was presented by the plaintiff, while here it is asserted as a defense. The distinction makes no difference. Defendants' estoppel theory is based on economic duress. *Korn* found that economic duress cannot be established upon facts sufficiently like those before us. (*London Homes, Inc.* v. *Korn, supra,* 234 Cal.App.2d 233.) This case cannot be distinguished meaningfully.

## C. *Hacienda's Cross-appeal*

In their cross-appeal, defendants contend the trial court erred when it granted summary adjudication on the cause of action for negligent misrepresentation alleged in their cross-complaint. We affirm this order.

Although defendants do not cite a single case or other legal authority to support their argument on cross-appeal, they do set out the facts which they claim support the cause of action for negligent misrepresentation. According to defendants, after the project opened and it became clear revenues would not meet expenses, the parties commenced discussions as to how to deal with the cash shortfall. These discussions involved Robert Wagner on behalf of

the borrowers and guarantors (Sanford Diller later became directly involved in the process) and Richard Olrich on behalf of River Bank Financial Group (RFG), which at all times acted as River Bank's agent. RFG and River Bank were aware of the significant cash shortfall. Defendants supplemented the project's cash flow by injecting additional cash to pay debt service and to keep the loans current. RFG and River Bank were aware that defendants were putting additional equity into the project. RFG and River Bank allegedly tied the continuing equity infusions by defendants to their own willingness to talk about a modification in loan terms. There is no direct evidence River Bank or RFG ever promised to provide a reduction in interest payments. Nevertheless, defendants contend we may infer from the foregoing facts that River Bank promised to conclude a reduction in interest payments. However, we may not do so on this record. The trial court found that defendants "have admitted in their testimony tha[t] no one on behalf of River Bank represented that River Bank would provide interest reductions on the loans to Hacienda . . . ." The trial court's conclusion on this point is amply supported by the record. Wagner and Diller both testified that no one from River Bank ever promised debt relief in exchange for further cash infusions. We will not draw an inference that is contrary to the defendants' own testimony in order to create a triable issue of fact. (*Thomspon* v. *Williams* (1989) 211 Cal.App.3d 566, 573-574 [259 Cal.Rptr. 518]; *Preach* v. *Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451 [16 Cal.Rptr.2d 320].) The trial court properly granted summary adjudication of defendants' cross-claim for negligent misrepresentation.

D. *Appeal No. A068152 (Attorney Fees)*

As indicated in a postjudgment motion, the trial court awarded $241,874 in attorney fees to defendants. Each of the guaranty agreements contained an attorney fee clause, and the court awarded the fees to defendants as the "prevailing party" under section 1717. In light of our reversal of the summary judgment, defendants can no longer be considered the prevailing party. Consequently, we reverse the award of attorney fees.

### III. DISPOSITION

The final judgment entered in favor of defendants is reversed. The order denying River Bank's motion for summary adjudication is affirmed as to the sham guaranty defense and reversed as to the estoppel defense. The order granting summary adjudication against defendants on their cross-claim is

affirmed. The order awarding attorney fees is reversed. Each party to bear its own costs on appeal.

Chin, P. J., and Corrigan, J., concurred.

Petitions for a rehearing were denied November 1, 1995, and the petition of all appellants for review by the Supreme Court was denied January 18, 1996.